UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

VERONICA CAJAMARCA,

          Plaintiff,

-against-

REGAL ENTERTAINMENT GROUP and
OTIS GADSDEN,

          Defendants.

CV 11-2780 (BMC)

**PLAINTIFF'S RESPONSE TO
DEFENDANTS' STATEMENT OF
MATERIAL FACTS PURSUANT TO
LOCAL CIVIL RULE 56.1**

        Plaintiff, Veronica Cajamarca, by and through her attorneys Phillips & Phillips, Attorneys at Law, PLLC, submit the following response to Defendants' statement of material facts, pursuant to Rule 56.1 of the Local Civil Rules of the Southern District of New York. Plaintiff primarily notes that Defendants' Statement of Facts does not comply with the local rules as the paragraphs are numbered and lettered at points making citation difficult to verify within the memorandum of law, because not all facts are supported by the cited evidence, because not all averred facts have cited support and because the evidence used to support many of the assertions is not admissible.

### Regal Entertainment Group

        1.    Regal, which is headquartered in Knoxville, Tennessee, owns and operates, directly and/or through subsidiary entities, movie theatres throughout the United States under the "Regal" and "United Artists" names, including the Regal-United Artists Midway Stadium 9 theatre located at 108-22 Queens Boulevard in Forest Hills, Queens, New York (the "Midway theatre"); the Regal Atlas Park Stadium 8 theatre located at 80-28 Cooper Avenue in Glendale, Queens, New York (the "Atlas Park theatre"); the Regal Union Square Stadium 14 theatre located at 850 Broadway, New York, New York  (the "Union Square theatre"); and the Regal-

United Artists Kaufman Astoria Stadium 14 theatre located at 35-30 38th Street in Long Island City, Queens, New York (the "Kaufman Astoria theatre").   (Complaint dated May 31, 2011 ("Compl.") ¶9; Declaration of Jennifer Jones dated November 23, 2011 ("Jones Decl."), ¶2)

Response: Plaintiff agrees that these averments are true.

2.      Regal has non-discrimination and unlawful harassment policies which are set forth for Regal managers in the Regal Theatre Management Manual ("TMM") and for Floor Staff employees in the Cast Performance Handbook ("CPH"), which proscribe sexual and other forms of harassment among employees.   (Defendants' Exhibits ("Exh.") 9 and 10; Declaration of Nick Green dated November 23, 2011 ("Green Decl."), ¶¶6, 9)

Response: Plaintiff agrees that these averments are true.

3.      All Regal Floor Staff employees are required to read and acknowledge the CPH, including the unlawful harassment policy.   (Green Decl. ¶9; Transcript of Deposition of Michael Gonzalez on October 24, 2011 ("Gonzalez Tr.") at 36-37 (submitted herewith as Exh. 6; Transcript of Deposition of Magdalis Veloz on October 24, 2011 ("Veloz Tr.") at 30 (submitted herewith as Exh. 5); Transcript of Deposition of Otis Gadsden on October 21, 2011 ("Gadsden Tr.") at 69-70 (submitted herewith as Exh. 4))

Response: Plaintiff objects to this statement and cites the deposition of Plaintiff Cajamarca who stated that "for the two years or so that [she] worked for Regal, [employees] were never properly trained to be informed about this type of situation" referring to sexual harassment. Deposition of Veronica Cajamarca, Exh. A, pp. 193-194.

4.      The CPH sets forth a complaint procedure whereby an employee who experiences or witnesses any form of harassment is required to report it either (a) to the employee's

immediate supervisor, (b) to a higher level manager or Regal's HR department, or (c) by calling Regal's complaint hotline, 1-877-TELL-REG.  (Exh. 10; Green Decl. ¶¶9-12)

Response: Plaintiff objects to this statement and cites the deposition of Plaintiff Cajamarca who stated that "for the two years or so that [she] worked for Regal, [employees] were never properly trained to be informed about this type of situation" referring to sexual harassment. Exh. A, pp. 193-194. Plaintiff additionally testified that she did not know what Defendants wanted her to do in her situation. Id. at pp. 195-196.

5.     Regal's complaint hotline, 1-877-TELL-REG, was at all relevant times posted in the employee break room at the Midway theatre.  (Veloz Tr. at 32-33; Green Decl. ¶11)

Response: Plaintiff agrees that these averments are true.

6.     Regal has a Four-Step disciplinary Process for its Floor Staff employees, whereby a manager may issue first, second, and third-step warnings to an employee for performance or disciplinary issues, and then a fourth-step notice of suspension while the theatre management reviews the employees' record and performance with Regal's Human Resources ("HR") department to determine whether the employee should be terminated.  (Exh. 39; Transcript of Deposition of Nick Green on October 25, 2011 ("Green Tr.") at 50-51 (submitted herewith as Exh. 7))

Response: Plaintiff objects as Green's testimony specifically stated that the HR department made all determinations and he merely reported the facts. Deposition of Nick Green, Exh. B, pp. 50-51. ("Q. So you don't make the determination whether it's the first step or second step or third step? A. Right. Q. You just report the information and [HR] make [the decision]? A. Yes.")

## Plaintiff Cajamarca's Employment History with Regal

7.      Plaintiff Veronica Cajamarca ("Cajamarca") was hired by Regal to work as a "Floor Staff" member at the Kaufman Astoria theatre beginning on around October 27, 2008. (Compl. ¶15)

Response: Plaintiff agrees that these averments are true.

8.      On October 27, 2008, Cajamarca acknowledged in writing that she had read Regal's CPH, which included Regal's anti-harassment policy and complaint procedures.  (Exh. 11; Green Decl. ¶12)

Response: While Plaintiff agrees that Plaintiff acknowledged that she had read the policy, she specifically testified that she did not have knowledge of what that policy was evidencing a procedure for explaining this policy which did not ensure that employees were aware of the policy. Exh. A, pp. 193-194.

9.      By February 2009, Cajamarca had received four written disciplinary warnings pursuant to Regal's Four-Step Disciplinary Process, including two "first step" warnings on November 8 and December 1, 2008; a "second step" warning on December 31, 2008; and a "third step" warning on January 9, 2009.  (Exh. 40, at D001013-19)

Response: Plaintiff agrees that these averments are true however notes and objects to any conclusions based on these averments as to the truthfulness of the underlying documents.

10.     On February 9, 2009, Cajamarca called Regal's hotline telephone number to complain about alleged non-sexual harassment of her by an associate manager at the Kaufman Astoria theatre, and a representative of Regal's Human Resources ("HR") department contacted Cajamarca the same day for more information about her complaint; after an investigation; Regal's HR department concluded its investigation of her complaint as "non-determinative" but instructed that the associate manager remain scheduled separately from Cajamarca.  (Exh. 41;

4

Transcript of Deposition of Veronica Cajamarca on October 20, 2011 ("Cajamarca Tr."), 126-131 (submitted herewith as Exh. 3))

Response: Plaintiff objects to the conclusion that Plaintiff spoke with a representative of Regal's Human Resources department, that there was an investigation, any conclusion of an investigation and that there was an instruction to separate Plaintiff from the associate manager. Not a single one of those specific averments are mentioned in the cited testimony.

11.    By letter dated March 4, 2009, Regal's HR department told Cajamarca that they had concluded their investigation of her complaint as "non-determinative".  (Exh. 41, at D000712)

Response: Plaintiff objects to the extent that there is no cited support for the notion that Plaintiff received this letter, there is no testimony that Plaintiff received this letter, and thus Defendants' conclusion that Plaintiff was "told" that these were there conclusions is not supported by the available and discoverable material.

12.    By March 6, 2009, Cajamarca had received two more written disciplinary warnings pursuant to Regal's four-step disciplinary process, including an intermediate warning on February 17, 2009, and a final, "fourth step" notice on March 6, 2009, pursuant to which Cajamarca was suspended.  (Exh. 40, at D001011-12)

Response: Plaintiff agrees that these averments are true.

13.    Following the issuance of the "fourth step" notice to Cajamarca, rather than terminate Cajamarca, Regal chose to grant her request to transfer to the Midway theatre.  (Exh. 40, at D001011; Cajamarca Tr. 132-33)

Response: Plaintiff objects to the conclusion that Defendants considered terminating Plaintiff. This is not stated in any of the cited evidence and further the portion that they refer to in

5

Plaintiff's testimony was validly objected to as Defendants asked that Plaintiff conclude Defendant Regal's purpose in doing something without any rationale for believing that she had knowledge of the circumstances surrounding those facts.

14.     At the Midway theatre, Cajamarca was employed as a Floor Staff member, and worked primarily as a box office cashier.  (Green Decl. ¶18; Cajamarca Tr. at 134)

Response: Plaintiff agrees that these averments are true.

15.     At the Midway theatre, Cajamarca received a written "third step" disciplinary warning on August 14, 2009, and another written "third step" warning on August 7, 2010.  (Exh. 40, at D001006, D001010)

Response: Plaintiff objects only to the extent that these warnings should not be construed to conclude that Plaintiff was not a good employee. Plaintiff's General Manager testified that she was a good employee and that while they worked together there was never any thought of terminating her. Exh. B, pp. 84.

16.     In December 2010, Cajamarca asked Regal management to transfer her to the Union Square theatre, and Regal agreed to schedule Cajamarca to work at the Union Square theatre on a trial basis.  (Compl. ¶76; Cajamarca Tr. 243-44; Green Tr. at 69, 73, 82-84, 88-89; Green Decl. ¶61; Declaration of Cathy Sills dated November 19, 2011 ("Sills Decl."), ¶¶3-6)

Response: Plaintiff objects only to the extent that Plaintiff was transferred on a temporary basis and not a trial basis according to Nick Green's testimony. Exh. B, p. 73.

17.     On or around January 14, 2011, Cajamarca contacted Regal's HR Department by telephone and spoke with Benefits Specialist Rubi Thomas; Cajamarca told Ms. Thomas that she needed leave because of personal problems for which she was receiving therapy, and that she needed more than 30 days' personal leave; Ms. Thomas told Cajamarca that she could apply for

a maximum of 30 days' personal leave, but could then apply for additional leave if needed. (Compl. ¶78; Declaration of Rubi Thomas dated November 22, 2011 ("Thomas Decl."), ¶¶3-4)

Response: Plaintiff agrees that these averments are true.

18.     By letter date January 25, 2011, Regal's HR department approved Cajamarca's request for personal leave from January 15 to February 14, 2011.  (Exh. 36; Declaration of Jean Fox dated November 23, 2011 ("Fox Decl."), ¶8; Thomas Decl. ¶5)

Response: Plaintiff agrees that these averments are true.

19.     By letter dated February 10, 2011, Regal's HR department approved Cajamarca's request for additional personal leave until March 14, 2011.  (Exh. 37, at Cajamarca 152; Fox Decl. ¶9)

Response: Plaintiff agrees that these averments are true.

20.     By letter dated March 16, 2011, Regal's HR department approved Cajamarca's request for additional personal leave through April 30, 2011.  (Exh. 37, at Cajamarca 153; Fox Decl. ¶9)

Response: Plaintiff agrees that these averments are true.

21.     On or around April 28, 2011, Cajamarca contacted Cathy Sills, General Manager of the Union Square theatre, to tell her that she intended to further extend her personal leave from Regal and that she wanted to return to work at the Union Square theatre after her leave ended; Ms. Sills told Cajamarca to contact her when she was ready to return to work to see what the theatre's needs would be at that time.  (Compl. ¶80; Sills Decl. ¶¶10-11)

Response: Plaintiff agrees that these averments are true.

22.     On or around May 2, 2011, Cajamarca contacted Regal's HR department by telephone and spoke with Jean Fox; Cajamarca told Ms. Fox that she wanted to extend her

personal leave again because her doctor would not let her return to work.  (Compl. ¶81; Fox Decl. ¶¶12-13)

Response: Plaintiff objects to the extent that the Complaint states that her doctor recommended that she not return to work. Complaint  ¶ 81.

23.     By letter dated Ma y 10, 2011, Regal's HR department told Cajamarca that because she had exhausted her personal leave and told them that she was unable to return to work, Cajamarca was being administratively discharged from Regal, and that Cajamarca would be eligible for rehire by Regal whenever she might be able to return to work if Regal would have a position available at that time.  (Compl. ¶82; Fox Decl. ¶15; Cajamarca Tr. at 247-48; Exh. 38)

Response: Plaintiff agrees that these averments are true.

24.     Cajamarca never told Regal that she was capable of returning to work or sought to be rehired by Regal.  (Cajamarca Tr. at 247-48)

Response: Plaintiff objects to this assertion since the evidence cited speaks only up until the date Plaintiff testified and further does not account for the possibility of a future time when Plaintiff may be able to return to work.

**Defendant Gadsden's Employment History with Regal**

25.     Defendant Gadsden was hired by Regal to work as a "Floor Staff" member at the Atlas Park theatre starting on around March 30, 2009.  (Gadsden Tr. at 15)

Response: Plaintiff agrees that these averments are true.

26.     On April 3, 2009, Gadsden acknowledged in writing that he had read Regal's CPH, which included Regal's anti-harassment policy and complaint procedures.  (Exh. 11, at D000797)

Response: Plaintiff agrees that these averments are true.

8

27.     In early 2010, Gadsden was made a "Shift Lead", which was a non-management position.  (Exh. 42; Gadsden Tr. at 15-16; Green Decl. ¶21)

Response: Plaintiff objects to this conclusion since whether an individual is a manager is a factual determination which should be made by a jury. Further, Plaintiff testified that Defendant Gadsden was her supervisor, told her what to do, when to go on break and had the ability to influence discipline. Exh. A, pp. 124, 142-143, 145-148.

28.     By February 7, 2010, Gadsden had completed his Shift Lead anti-harassment, discrimination, and retaliation training modules.  (Exh. 11, at D000793; Green Tr. at 51-52)

Response: Plaintiff agrees that these averments are true.

29.     In or around February or March 2010, Gadsden was transferred to the Midway theatre.  (Compl. ¶18; Gadsden Tr. at 16; Green Decl. ¶19)

Response: Plaintiff agrees that these averments are true.

30.     At the Midway theatre, Gadsden worked as a Floor Staff employee and "Shift Lead" up until around July 2010.  (Exh. 13; Green Decl. ¶¶20, 24)

Response: Plaintiff agrees that these averments are true.

31.     In July 2010, the Midway theatre stopped using Shift Leads, and Gadsden was instructed to stop wearing his "Shift Lead" nametag and worked only as a regular Floor Staff employee.  (Exh. 13, 43; Green Decl. ¶¶ 24, 25; Gadsden Tr. 21-22; Transcript of Deposition of Jane Cinsov on November 2, 2010 ("Cinsov Tr."), 12-13 (submitted herewith as Exh. 8))

Response: Plaintiff objects since none of the sources cited state that Defendant Gadsden stopped wearing his "shift lead" nametag in July of 2010.

32.     Since July 2010 until the present day, Gadsden has remained employed by Regal as a Floor Staff employee at the Midway theatre.  (Gadsden Tr. at 7)

Response: Plaintiff objects to the extent that Defendants state that the shift lead position was converted into a senior staff member position. Def. Exh. 43.

33.    Other than the complaints by Cajamarca against Gadsden which are alleged in the Complaint herein, no one has ever complained to Regal of harassing or discriminatory conduct by Gadsden.  (Green Decl. ¶16; Cinsov Tr. at 36; Gadsden Tr. at 54)

Response: Plaintiff objects to the notion that no one has ever complained to Regal of such conduct by Defendant Gadsden since the sources cited above are not dispositive of this issue.

### The Shift Lead Position

34.    The Shift Lead position which Gadsden held was a non-management position, and no other employee reported either directly or indirectly to the Shift Lead.  (Exh. 42; Cajamarca Tr. at 146-49; Gadsden Tr. at 15-16; Green Decl. ¶21)

Response: Plaintiff objects to this conclusion since whether an individual reports to someone is a factual determination which should be made by a jury. Further, Plaintiff testified that Defendant Gadsden was her supervisor, told her what to do, when to go on break and had the ability to influence discipline. Exh. A, pp. 124, 142-143, 145-148.

35.    While Regal theatre managers are required to wear a jacket and tie or equivalent dress clothes, Shift Leads wore the same Regal-logo polo shirt and black uniform slacks worn by other Floor Staff employees; further, at the Midway theatre, Shift Leads wore the same type of nametags as other Floor Staff employees, which did not differentiate them from other Floor Staff employees.  (Green Decl. ¶22; Cinsov Tr. 13; Veloz Tr. at 13-14)

Response: Plaintiff objects as the shift lead position wore a different name tag from other employees. Exh. A, pp. 146, 221.

36.     At the Midway theater, managers stored their personal belongings and clothing in the managers' office, while Shift Leads were required to use the same lockers in the employee break room that were used by other Floor Staff employees. (Green Decl. ¶23)

Response: Plaintiff agrees that these averments are true.

37.     As a Shift Lead, Gadsden's responsibilities, in addition to performing the regular Floor Staff functions of an usher or concession worker, were "to focus on one area (i.e. box office, concessions, ushers) by performing the duties of the position as well as assisting other case members as need; and informing management should the area need attention".  (Exh. 42, at D001843-44)

Response: Plaintiff objects since this assertion seeks to claim that a memo from their corporate office is dispositive of the actual acts of shift leads which were more than what is listed. Exh. A, pp. 145-148.

38.      As Shift Lead, Gadsden could not and did not, and had no authority to, hire or fire any employee, schedule any employee, allow an employee to take a day off, or discipline any employee. (Exh. 42; Cajamarca Tr. at 146-49; Gadsden Tr. at 15-16; Gonzalez Tr. at 10-11; Green Decl. ¶21)

Response: Plaintiff objects to this assertion to the extent that Plaintiff believes that the shift lead position had the ability to influence discipline. Exh. A, p. 148.

39.     When Gadsden worked as a Shift Lead, Cajamarca did not consider him to be a manager and knew that he did not work in the theatre managers' office; never referred to Gadsden at the theatre as her "supervisor"; knew that Gadsden did not set her schedule and could not authorize her to take a day off; knew that if she asked Gadsden – or any Shift Lead – if she could take a break, he would have to ask a manager to allow it; and knew that Gadsden's ability

to influence a manager to discipline her was no different than her ability to influence a manager to discipline him.  (Cajamarca Tr. at 146-49)

Response: Plaintiff objects because the conclusions drawn from this portion of testimony are not logically concluded from the testimony cited.

## The Relationship Between Cajamarca and Gadsden

40.     Cajamarca and Gadsden first met around or shortly after the time that Gadsden transferred to the Midway theatre in around March 2010.  (Compl. ¶18)

Response: Plaintiff agrees that these averments are true.

41.     At the time that Cajamarca and Gadsden met, Gadsden was separated from his wife.  (Gadsden Tr. at 19-20)

Response: Plaintiff agrees that these averments are true.

42.     In or around May 2010, Cajamarca and Gadsden went to Starbucks together while they were both on a break from the Midway theatre, and sometime after that, when Gadsden was working an evening shift at the Midway theatre, Cajamarca had her young son bring Gadsden the same drink he had ordered from Starbucks with her.  (Gadsden Tr. at 27, 31)

Response: Plaintiff agrees that these averments are true.

43.     In around May or June 2010, Cajamarca accepted Gadsden's offer of a ride home from work, and Gadsden drove Cajamarca to her home.  (Compl. ¶27; Gadsden Tr. at 28, 33-34)

Response: Plaintiff agrees that these averments are true.

44.     In or around early summer of 2010, Cajamarca made plans with Gadsden to make an overnight car trip with him and their respective children to Hershey Park, Pennsylvania, although they never scheduled or made the trip.  (Cajamarca Tr. at 228-31; Gadsden Tr. at 50-51)

Response: Plaintiff agrees that these averments are true.

45. In August 2010, Cajamarca and Gadsden sat together with their respective children to watch a movie at the Midway theatre.  (Gadsden Tr. at 32)

Response: Plaintiff agrees that these averments are true.

46. On September 23, 2010, Cajamarca loaned Gadsden $600, with which Gadsden wished to obtain a power tool for a freelance construction job, in exchange for Gadsden's promise to pay her back $900 by October 20, 2010, and they executed a written agreement to that effect; as admitted by Cajamarca, she made the loan voluntarily and Gadsden did not force her to do so.  (Exh. 16, at D000847; Cajamarca Tr. at 136-41; Gadsden Tr. at 35-41)

Response: Plaintiff objects since the actual testimony shows that Plaintiff felt as if she had to give the loan and was harassed until she loaned Defendant Gadsden the money. Exh. A, pp. 142-144.

47. On October 2, 2010, Cajamarca asked Gadsden to repay $200 of the loan money to her immediately, and Gadsden told her he was unable to do so because he had used the money to obtain the power tool and had not been paid yet for his construction job.  (Exh. 44; Cajamarca Tr. at 142-45)

Response: Plaintiff objects to the conclusion that "Gadsden told her he was unable to do so because he had used the money to obtain the power tool and had not been paid yet for his construction job" as this is not supported by any of the cited evidence and further Plaintiff testified that she did not know why he had borrowed the money. Exh. A, pp. 143-145.

48. On October 5, 2010, Cajamarca asked Gadsden to repay $450 of the loan money immediately.  (Exh. 44; Cajamarca Tr. at 142-45)

Response: Plaintiff objects as Plaintiff did not say immediately but rather asked if he could pay a portion of the money back on time and offered an additional extension of time for Defendant Gadsden to return the money. Def. Exh. 44. Plaintiff notes that this averment makes no attempt to be truthful and purposefully alters the actual testimony and exchange shown in Defendants' Exhibit 44 in order to fit these allegations into their storyline.

49.     In around September and October 2010, Gadsden was attempting a reconciliation with his wife, and occasionally brought his wife to the Midway theatre while Cajamarca was working.  (Gadsden Tr. at 20, 49, 90)

Response: Plaintiff objects because Plaintiff did not know that Defendant Gadsden brought his wife to the theater as is implied. Exh. A, pp. 206-207.

**Regal's Response to
Cajamarca's Complaints About Gadsden**

50.     On or around October 10, 2010, Cajamarca told Regal assistant manager Jane Cinsov that Gadsden had tried to kiss her and then exposed his penis to her in the employee break room, and Ms. Cinsov, following Regal's anti-harassment policy, told Cajamarca to report the incident to the Midway theatre's general manager Nick Greene; Cajamarca told Ms. Cinsov that she did not want to report the incident, and Ms. Cinsov told her that if she did not report it, then Ms. Cinsov would have to do so.  (Compl. ¶¶51-53; Cajamarca Tr. at 188-191; Cinsov Tr. at 15, 19-24; Exh. 22 at D000165)

Response: Plaintiff agrees that these averments are true.

51.     On October 11, 2010, the following occurred:

(a)     Cajamarca told Gadsden that she was going to file a harassment complaint against him with Regal (Exh. 16, at D000843; Gadsden Tr. at 44; Cajamarca Tr. at 205);

Response: Plaintiff objects and notes that Plaintiff did contact Defendant Gadsden as instructed by management to attempt to get him to admit what he had done. Exh. A, pp. 207-208. Plaintiff further notes that Defendants' citation of Plaintiff's deposition is extremely misleading since Plaintiff specifically addressed this allegation by stating that she does not recall texting this. Exh. A, pp. 205-206.

(b)    Cajamarca  complained to Nick Green that when she and Gadsden were in the employee break room "a couple of weeks ago", Gadsden offered her a "friendly kiss" and then exposed his penis to her twice and made sexually aggressive, unwelcome comments to her; Cajamarca did not complain about or mention any other harassing, threatening, or unwelcome conduct by Gadsden (Compl.  ¶55; Exh. 15; Exh. 20 at D000165; Green Decl. ¶30);

Response: Plaintiff objects because this assertion ignores significant amounts of evidence. Specifically, Plaintiff's full complaint detailed how Defendant Gadsden had pressured her for months to perform sexual acts. Defs. Exh. 20.

(c)    Nick Green immediately took steps to ensure that Gadsden would no longer be scheduled to work at the same time as Cajamarca, and instructed Cajamarca not to talk to Gadsden or discuss her complaint with other employees; Mr. Green also checked the current employee schedule, saw that Cajamarca and Gadsden were scheduled to work at the same time the following day, October 12, and offered to reschedule Cajamarca, but Cajamarca declined his offer (Green Decl. ¶¶28-29; Exh. 20); and

Response: Plaintiff objects because, again, Defendants' factual assertion ignores large portions of the factual record. Specifically, Plaintiff claims that Nick Green instructed her to talk to

15

Defendant Gadsden to get him to admit what he had done and further no steps were immediately taken to assist Plaintiff. Exh. A, pp. 207-208; Defs. Exh. 20.

(d)     Upon being informed by Nick Green of Cajamarca's complaint, Regal HR Manager Jennifer Jones opened an investigation file and instructed Mr. Green to obtain anonymous "generic" survey statements from five other female floor staff employees who worked with Gadsden regarding whether they had experienced any harassment in the workplace.  (Jones Decl. ¶¶6-7; Green Decl. ¶32)

Response: Plaintiff agrees that these averments are true.

52.     On October 13, 2010, the following occurred:

(a)     Jennifer Jones sent Cajamarca a letter informing her that HR was investigating her complaint, and invited Cajamarca to contact her with any additional information.  (Exh. 30; Jones Decl. ¶8)

Response: Plaintiff agrees that these averments are true.

(b)     Gadsden came to see Nick Green to tell him Cajamarca had told him she was going to complain to Regal about him; Gadsden brought Mr. Green his own prepared written statement, and also wrote a second statement at Mr. Green's request (Exh. 16; Gadsden Tr. at 84-91; Green Decl. ¶38);

Response: Plaintiff agrees that these averments are true to the extent only that Defendant Gadsden stated these things and not to the truth of the matter asserted.

(c)     Gadsden told Nick Green that in May 2010, he had kissed Cajamarca in the employee break room but denied exposing himself to her; noted that Cajamarca had continued to be friendly with him after he kissed her in the break room and had even loaned him money on September 23, 2010; and stated his belief that Cajamarca was angry with him

because he was reconciling with his wife and did not return Cajamarca's interest in him. (Exh. 16; Green Decl. ¶37)

Response: Plaintiff objects to the extent that Defendant Gadsden did not at any point in his deposition state that he believed Plaintiff was interested in him in any capacity other than as friends, specifically claiming that no sexual interest existed between himself and Plaintiff. Deposition of Defendant Otis Gadsden, Exh. C, pp. 85-87.

53.    By October 21, 2010, Nick Green had obtained generic surveys from five female employees who worked with Gadsden, each of whom stated she had not experienced any harassing conduct in the workplace, and Mr. Green forwarded them to Ms. Jones.  (Exh. 19, 21; Green Decl. ¶43)

Response: Plaintiff objects as the generic surveys do not ask about harassing conduct but rather ask specific questions about the individual's knowledge of sexual misconduct in the work place.

54.    On October 22, 2010, the following occurred:

(a)    In the morning, Cajamarca contacted Jennifer Jones by telephone and told her that Gadsden had threatened her the day before, without telling her she had actually contacted Gadsden by telephone, and also told Ms. Jones and that there were additional incidents of unwelcome conduct from Gadsden that were not mentioned in her written statement of October 11, 2010 (Jones Decl. ¶¶10, 13; Exh. 14 at D001382-83);

Response: Plaintiff objects to the extent that there is dispute about who contacted who when the threat was made as even Defendant Gadsden admitted that he had called her, claiming that it was in response to a call Plaintiff made. Exh. C, pp. 92-93.

(b)    In response to Cajamarca's telephone call, Jennifer Jones promptly contacted Nick Green and instructed him to suspend Gadsden immediately while they investigated

Cajamarca's complaint that Gadsden had threatened her, to get a complete written statement from Cajamarca about her allegations of additional harassing conduct by Gadsden, and to obtain anonymous "generic" survey statements from additional female employees at the Midway theatre as to whether they had experienced any harassment in the workplace.  (Jones Decl. ¶11; Green Decl. ¶40; Exh. 14 at D001382-83)

Response: Plaintiff agrees that a majority of these facts occurred except that the characterization of the acts which were previously stated in Paragraph 53 are improper.

55.    On October 23, 2010, which was the next day that Gadsden was scheduled to work, Regal issued him a Fourth-Step notice of suspension, and suspended him.  (Green Decl. ¶41; Exh. 17)

Response: Plaintiff objects to the date as the Defendants' Exhibit 17 specifically says it occurred on October 24, 2010 when the document was signed but the occurrence that led to the suspension occurred on October 23, 2010.

56.    On October 24, 2010, the following occurred:

(a)    Gadsden provide his written statement to Nick Green responding to Cajamarca's claim that he had threatened her, stating that Cajamarca had called him on October 21, 2010 and insisted on discussing their loan agreement despite Nick Green's instructions that they were not to speak with each other, and that he had agreed to call her back to discuss his repayment of the loan (Green Decl. ¶42; Exh. 18); and

Response: Plaintiff objects as this is not an appropriate fact to include in a Rule 56.1 statement as the conclusion is not that either of these acts occurred but merely that Defendant Gadsden claimed them to have happened.

18

(b)     Gadsden provided his telephone call records to Nick Green, showing that Cajamarca had called Gadsden on October 21, 2010, at 7:05 p.m., and that Gadsden returned Cajamarca's call at 7:50 p.m. that same evening; the next day, Nick Green forwarded Gadsden's telephone call records to Jennifer Jones.  (Green Decl. ¶42; Exh. 18)

Response: Plaintiff agrees that these averments are true.

57.     On November 2, 2010, Cajamarca told Nick Green that after her alleged incident with Gadsden in the employee break room, she left the break room and ran into Regal manager Jenna Sooknanan, who saw that she was crying and asked her what was wrong; on that same day, Mr. Green obtained a written statement from Ms. Sooknanan, who stated that a few days earlier, Cajamarca had contacted her by telephone and asked her if she remembered the incident, and that she had told Cajamarca she did not remember it.   (Green Decl. ¶43; Exh. 19 at D000876-77)

Response: Plaintiff agrees that these averments are true to the extent that these are the recollection of the witnesses but Plaintiff objects to the extent that this statement is merely the opinion of fact witnesses and not dispositive of any single fact that actually occurred other than that those conversations occurred.

58.     On November 3, 2010, Regal management permitted Cajamarca to use a Regal computer in the managers' office, during her regular paid work shift, to type her statement about the additional alleged incidents of harassment by Gadsden which she had mentioned to Jennifer Jones on October 22, 2010, and Cajamarca took up nearly her entire scheduled shift to type a seven-page written statement; the following day, Nick Green sent the written statement to Jennifer Jones.  (Exh. 20; Green Decl. ¶45)

Response: Plaintiff objects to the inclusion of additional, extraneous facts supported only by a declaration of their General Manager.

59.     By November 7, 2010, Nick Green had obtained generic survey responses from additional female employees at the Midway theatre, none of whom reported experiencing any sexual or other harassment from anyone at Regal, and he forwarded the surveys to Jennifer Jones. (Green Decl. ¶43; Jones Decl. ¶15; Exh. 19)

Response: Plaintiff objects to the characterization of the responses within the generic surveys since the questions asked cannot reasonably be considered to implicate that no sexual or other harassment occurred.

60.     On November 11, 2010, Jennifer Jones obtained additional written statements from Nick Green and Jane Cinsov about their respective dealings and communications with Cajamarca regarding her complaint about Gadsden.  (Green Decl. ¶46; Jones Decl. ¶16; Exh. 21)

Response: Plaintiff objects because the Declarations, prepared solely for this motion, actually state that the date was either November 10, 2010 or November 12, 2010, but do not agree as to the date.

61.     By November 18, 2010, the HR department's investigation of Cajamarca's complaint about Gadsden had produced the following evidence:

(a)     Written "generic" statements from at least nine female employees who worked with Gadsden that they had not experienced and were not aware of any harassing or other unwelcome activity by Gadsden or anyone else at Regal (Exh. 19);

Response: Plaintiff objects since Jenna Sooknanan stated that she was aware of the situation as she had discussed it with Plaintiff. Defs. Exh. 19.

20

(b)     Gadsden's admission that he had once kissed Cajamarca in the employee break room, although he contended it happened in May 2010 while Cajamarca claimed it happened in late September 2010 (Exh. 16);

Response: Plaintiff objects to this statement since it assumes that both employees are referencing the same instance which is a question of fact as the parties disagree substantially about what happened. This is evident in the cited Defendants' Exhibit 16.

(c)     Gadsden's telephone call records supporting his statement that on the date on which Cajamarca claimed Gadsden had threatened her, she had actually initiated communication with him in violation of Nick Green's instructions to her (Exh. 18);

Response: Plaintiff objects since Plaintiff claims that she was specifically told to attempt to get Defendant Gadsden to admit that he had sexually harassed her. Exh. A, pp. 207-208. The cited support does not at all support the conclusion that Nick Green instructed Plaintiff not to communicate with Defendant Gadsden.

(d)     Evidence that just a few days before the day on which Cajamarca claimed Gadsden exposed himself to her, she had loaned him money and executed a loan agreement with him (Exh. 16); and

Response: Plaintiff objects as the cited material does not support the conclusion that the sexual harassment occurred after Plaintiff had loaned Defendant Gadsden money.

(e)     Other uncorroborated claims by Cajamarca which were contested and directly contradicted by Gadsden.  (Exh. 15, 16, 18, 20)

Response: Plaintiff objects because Defendant Gadsden did not contest and directly contradict the accusations but rather indifferently denied a majority of the assertions without specific factual contradiction.

62.     On November 18, 2010, Jennifer Jones told Nick Green that as a result of the HR department's investigation of Cajamarca's complaint about Gadsden, Gadsden must receive a Third-Step, "Final Written" notice because of his admitted kissing of Cajamarca in the employee break room; and that Gadsden could return to work but must continue to be scheduled separately from Cajamarca.  (Green Decl. ¶47; Jones Decl. ¶19; Exh. 14 at D001373)

Response: Plaintiff objects because the cited documentation does not support the notion that Defendant Gadsden was issued the Third-Step Final Written notice because of the kissing and it specifically states that it was because of "Inappropriate touching/behavior." Defs. Exh. 22.

63.     On November 18, 2010, Nick Green issued a Third-Step, "Final Written" notice to Gadsden and reminded him that he could not be scheduled to work at the same time as Cajamarca.  (Green Decl. ¶48; Exh. 22)

Response: Plaintiff agrees that these averments are true.

64.     By letter dated November 19, 2010, Jennifer Jones told Cajamarca that Regal had concluded its investigation of her complaint about Gadsden and taken appropriate corrective action.  (Jones Decl. ¶20; Exh. 31)

Response: Plaintiff objects to this averment because, while the letter states this, it is hearsay as to whether appropriate corrective action was actually taken and further whether the action taken was appropriate or corrective is a question of fact clearly disputed by the current action which specifically claims that the actions were not appropriate. Complaint ¶¶ 83-99.

### Regal's Responses to Cajamarca's
### Complaints About Other Employees

65.     On November 21, 2010, Cajamarca complained to Nick Green that other employees had been teasing and bothering her since she had complained about Gadsden, and that on the previous day, November 20th, her manager had cut her work hours unfairly by sending her

home early in order to accommodate Gadsden; on December 2, 2010, Cajamarca sent a letter dated November 28, 2010 to Jennifer Jones, in which Cajamarca described her complaints in detail.  (Compl. ¶¶69-70; Green Decl. ¶¶49-50; Exh. 32)

Response: Plaintiff objects to the characterization of the complaints made since they were specifically speaking to an atmosphere and the regular treatment she received as opposed to the specific events noted by Defendants which, while included in the letter, were only a portion of the events of which Plaintiff she complained. Def. Exh. 32.

66.     In her statements to Nick Green and Jennifer Jones, Cajamarca complained generally that her co-workers "are treating me different", but described only the following four specific incidents:

Response: Plaintiff objects to the characterization of the complaints made since they were specifically speaking to an atmosphere and the regular treatment she received as opposed to the specific events noted by Defendants which, while included in the letter, were only a portion of the events of which Plaintiff she complained. Def. Exh. 32.

(a)     On an unspecified date in late October 2010, manager Adam Gonzalez, whom Cajamarca considered to be "a really good person", "made the mistake of trying to make me feel comfortable" by joking with her and gyrating his hips and saying "'aw look at me'", which Cajamarca interpreted as an imitation of Gadsden (Compl. ¶58; Exh. 32 at D000935);

Response: Plaintiff agrees that this was one complaint made in that letter, however, Plaintiff's complaint included details about an atmosphere to which she was subjected due to her complaint. Further, a significant portion of the complaint related to the stress Plaintiff endured due to the fear that she would run into Defendant Gadsden who had physically threatened her not long before this letter was sent. Def. Exh. 32.

(b)     On November 16, 2010, Cajamarca's young son came to the Midway theatre while she was working and asked for her, and manager Francisco Mercedes Perdomo told her son that Cajamarca had been fired and dragged out by the police, which upset her son (Compl. ¶64; Exh. 32 at D000935);

Response: Plaintiff agrees that this was one complaint made in that letter, however, Plaintiff's complaint included details about an atmosphere to which she was subjected due to her complaint. Further, a significant portion of the complaint related to the stress Plaintiff endured due to the fear that she would run into Defendant Gadsden who had physically threatened her not long before this letter was sent. Def. Exh. 32.

(c)     On November 19, 2010, Cajamarca saw her fellow Floor Staff worker Magdalis Veloz talking to Gasden in the theatre lobby, and when Cajamarca became upset and asked Ms. Veloz what was going on, Ms. Veloz tried to comfort her and told her that "Otis told her that he won the case and that since HR can't prove he touched me he was coming back" (Compl. ¶66; Exh. 32 at D000935-36); and

Response: Plaintiff agrees that this was one complaint made in that letter, however, Plaintiff's complaint included details about an atmosphere to which she was subjected due to her complaint. Further, a significant portion of the complaint related to the stress Plaintiff endured due to the fear that she would run into Defendant Gadsden who had physically threatened her not long before this letter was sent. Def. Exh. 32.

(d)     On November 20, 2010, Cajamarca was scheduled to work until 6:00 p.m., but manager Adam Gonzalez sent her home early at around 4:30 p.m., telling her it was slow; Cajamarca later concluded that she was sent home early because Gadsden was coming in to work.  (Compl. ¶¶67, 70; Exh. 32 at D000936)

Response: Plaintiff agrees that this was one complaint made in that letter, however, Plaintiff's complaint included details about an atmosphere to which she was subjected due to her complaint. Further, a significant portion of the complaint related to the stress Plaintiff endured due to the fear that she would run into Defendant Gadsden who had physically threatened her not long before this letter was sent. Def. Exh. 32.

67.     In response to Cajamarca's complaints, Nick Green, under the direction of Jennifer Jones, investigated them, and talked to and obtained written statements from five employees whom Cajamarca identified as witnessing or being involved in the events she complained about (Green Decl. ¶¶51-52, 55; Jones Decl. ¶23); the investigation produced the following:

Response: Plaintiff objects to these assertions as they are based on un-vetted declarations submitted solely in support of this motion and which draw conclusions about occurrences not within the specific purview of the declarants. Further, these statements contain hearsay statements.

(a)     Regal's time records showed that on November 20, 2010, Gadsden, who was scheduled to begin work at 6:30 p.m., began work that day at 6:32 p.m., disproving Cajamarca's claim that she was sent home earlier than 6:00 p.m. so that Gadsden could work (Green Decl. ¶52; Exh. 27, at D001891, D001909);

Response: Plaintiff objects since the conclusion that these records disprove Plaintiff's claim are not logically conclusive and do not prove Defendants' conclusion at all. Further, conclusions of motivation, especially drawn by individuals not actually involved in the situation, are not appropriately asserted in a Rule 56.1 statement.

25

     (b)     Francisco Mercedes admitted that when Cajamarca's son came to the Midway theatre and asked for her on November 16, 2010, he told him that she did not work there anymore, and stated that he did so because he already knew and had previously joked with Cajamarca's two sons, who frequently came to the theatre when Cajamarca was working (Jones Decl. ¶24(b); Exh. 24 at D00927-29);

Response: Plaintiff agrees that these averments are true.

     (c)     Gadsden and Magdalis Veloz both stated that when Gadsden returned to work on November 19, 2010, Ms. Veloz greeted him and Gadsden told her he was back because he had won his case (Jones Decl. ¶24(c); Exh. 24 at D000922 and D000930); and

Response: Plaintiff objects because Defendants' statement merely demonstrates that there was a disagreement about what occurred and does not establish any relevant fact.

     (f)     Other uncorroborated claims by Cajamarca which were contested or contradicted by the employees whom Cajamarca claimed were involved in or who witnessed the alleged incidents.  (Exh. 24, 32)

Response: Plaintiff objects because Defendants' statement ignores a vast majority of the complaints included in Plaintiff's letter and demonstrates clearly that Defendants' reaction to the complaint was deficient. Def. Exh. 32. This type of blanket claim without any factual foundation while ignoring numerous allegations made by Plaintiff at the time underscores the inappropriateness of Defendants' motion.

     68.     By letter dated December 21, 2010, Jennifer Jones told Cajamarca that Regal had concluded its investigation of her complaint and taken corrective action, and invited her to contact her with any questions or comments.  (Jones Decl. ¶26; Exh. 33)

Response: Plaintiff objects to this averment because, while the letter states that corrective action was taken, it is hearsay as to whether corrective action was actually taken and further whether the action taken was corrective is a question of fact clearly disputed by the current action which specifically claims that the actions were not appropriate to the extent required by law. Complaint ¶¶ 83-99.

69.     On December 22, 2010, as a result of Regal's investigation, Nick Green issued a Second-Step written notice to Francisco Mercedes Perdomo for inappropriate conduct regarding his admitted statement to Cajamarca's son that she had been fired.  (Green Decl. ¶60; Exh. 26)

Response: Plaintiff agrees that these averments are true.

**Cajamarca's Allegation that She
Was "Written Up" as Retaliation**

70.     In the afternoon of December 18, 2010, Cajamarca was the sole Floor Staff employee stationed to greet customers and take tickets in the lobby, but left her post and went into the employee break room to eat and drink something; manager Francisco Mercedes Perdomo discovered her absent from her post, and Nick Green had Cajamarca make a written statement explaining her conduct.  (Compl. ¶¶73-74; Green Decl. ¶¶56, 58; Exh. 25)

Response: Plaintiff objects as many of the statements cited in the Green Declaration are hearsay and further that nowhere in the cited material does it even claim that Plaintiff was the "sole Floor Staff employee stationed to greet customers and take tickets in the lobby."

71.     Cajamarca stated that she had left her post to get something to eat and drink because she had become dizzy due to medication which she was taking, and she eventually provided Regal with a doctor's note regarding the medication.  (Compl. ¶¶73-74; Green Decl. ¶57; Exh. 25)

Response: Plaintiff objects as the doctor's note regarding Plaintiff's medication is not cited nor is any statement or fact stating that it was provided. Further, this note was not provided in discovery to our knowledge.

72.     Based on Cajamarca's explanation and documentation, neither Nick Green nor any other manager gave Cajamarca a Four-Step warning or any other disciplinary write-up, and Mr. Green asked Cajamarca to keep them apprised of any accommodation she might need for her medication.  (Green Decl. ¶59)

Response: Plaintiff objects since the Green Declaration merely provides a contradiction of facts and does not provide a conclusive factual statement. As such, this statement is not appropriately included in a Rule 56.1 statement of facts.

## ADDITIONALLY FACTS WHICH PLAINTIFF CONTENDS ARE NOT IN CONTROVERSY

1. Defendant Gadsden was involved in two violent crimes before Plaintiff made the claim that he threatened her. Exh. C, pp. 12-14.

2. All decisions about what to do with complaints of any kind were decided by Defendants' Human Resources department. Deposition of Nick Green, Exh. B, pp. 50-51.

3. Defendants' Human Resources Manager responsible for the **entire** northeast region has been Jennifer Jones since August of 2010 who works in Knoxville, Tennessee. Jones Decl. ¶ 1.

4. The generic questionnaire that Defendants utilized during the investigation into Plaintiff's claims asked no specific questions about the situation and was not followed with any further investigation to find witnesses. Def. Exh. 9; Exh. B, pp. 15-18.

5. The purpose of these questionnaires was to find out if there were other instances of harassment and not to address Plaintiff's complaints. Exh. B, pp. 15-16.

6. Plaintiff, throughout the time she worked under Nick Green was a good employee who he never contemplated terminating. Exh. B, pp. 84.

7. Following the complaint of sexual harassment and within her complaint about retaliation, on or about November 28, 2010 Plaintiff complained that she was stressed, shocked, horribly upset and crying because Defendant Gadsden was coming back to work. Def. Exh. 32.

8. Plaintiff additionally complained that she was being treated differently by everyone at the theater and included specific factual claims about what was happening including that when she "walk[s] in a room at work, people get quiet, or the people who use to talk to me … don't even want to be around me." Def. Exh. 32.

9. Plaintiff was instructed to never discuss the situation with anyone at work and consistently burst into tears while at work following her complaint. Deposition of Jane Cinsov, Exh. D, pp. 24-26.

10. Defendants' investigation of the matter did not in any way focus on or otherwise address Plaintiff's Complaints as detailed in the previously paragraphs. Defs. Exhs. 24, 27 & 32.

11. Plaintiff informed Defendants on or about November 28, 2010 that she was seeing a doctor because of the stress caused by Defendants permitting Defendant Gadsden to continue working in the same location as Plaintiff after Plaintiff alleged sexual harassment and retaliatory threats. As such, Defendants were aware that Plaintiff was emotionally and physically suffering due to the inadequacy of their actions. Defs. Exh. 32.

12. Defendant Gadsden did not repay Plaintiff any portion of the $600.00 dollars borrowed or $900.00 contractually promised. Exh. C, pp. 80-81.

13. Defendant Gadsden asked Jane Cinsov, his manager, to go on several dates but was turned down each time. Exh. D, pp. 16-17.

14. After being rejected by Ms. Cinsov, a complaint was filed against Defendant Gadsden for inappropriate behavior towards a manager when he said something inappropriate to Ms. Cinsov. Exh. B, pp. 25-26.

15. When asked at her deposition if anyone had told her what to say at her deposition, Jane Cinsov was instructed not to answer by her attorney. Exh. D, p. 43.

Dated:   New York, New York
         December 22, 2011

                                        Sincerely

                                        _____/s/Jesse C. Rose_____
                                        Jesse C. Rose (JR-2409)
                                            Of Counsel
                                        William K. Phillips (WP-0409)
                                        **Phillips & Phillips, PLLC**
                                         *Attorneys for Plaintiff*
                                        30 Broad Street, 35th Floor
                                        New York, NY 10004
                                        (212) 248-7431
                                        Fax: (212) 587-4169
                                        JRose@tpglaws.com
                                        WKPhillips@tpglaws.com