UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------- X

VERONICA CAJAMARCA,                                  :

                                        Plaintiff,   :

                 - against –                          :

REGAL ENTERTAINMENT GROUP and                        :
OTIS GADSDEN individually,                            :

                                       Defendants.   :

-------------------------------------------------------- X

**CORRECTED MEMORANDUM
DECISION AND ORDER**

11 Civ. 2780 (BMC)

**COGAN**, District Judge.

     This Title VII action is before me on defendants' motion for summary judgment. For the purposes of this motion, there is no dispute that plaintiff was sexually harassed by the individual defendant, a fellow employee who was either of equal standing or perhaps slightly superior to her. The question raised by the motion is whether the corporate defendant had an adequate anti-discrimination policy and practice in place, whether it appropriately implemented that practice once it was advised of the alleged discrimination against plaintiff, and whether it retaliated against plaintiff for having complained. As to those questions, the objective evidence is all in the corporate defendant's favor. It is countered only by plaintiff's subjective feelings and beliefs. That is not enough to survive summary judgment, and, accordingly, the motion is granted.

## BACKGROUND

     Plaintiff began working as a member of the "Floor Staff" at one of defendant Regal Entertainment Group's movie theatres in late October, 2008.[1] "Floor staff" consists of the

---

[1] The Court has set forth the facts in the light most favorable to plaintiff. See Howley v. Town of Stratford, 217 F.3d 141, 150-51 (2d Cir. 2000). However, plaintiff's written complaints to Regal and her deposition testimony intersperse the events she describes with explanations and conclusions of why events occurred and how she feels

employees one most commonly sees at the movies, such as box office cashiers, ushers, and concession stand workers. Prior to starting her employment with Regal, plaintiff acknowledged in writing that she had read Regal's employee manual, which included Regal's anti-harassment policy and complaint reporting procedures. After about four months as a Regal employee, plaintiff had accumulated sufficient disciplinary warnings to warrant termination under Regal's policies; instead, however, Regal (after a suspension) granted her request and transferred her in March 2009 to its Midway theatre in Forest Hills, Queens. There, she continued as a member of the Floor Staff, primarily in the box office.

At Midway, she met defendant Otis Gadsden. He had also worked at another Regal theatre, and transferred to Midway about a year after plaintiff. He does not appear to have had disciplinary problems at the prior theatre as severe as plaintiff's, but he did have a criminal conviction for burglary and served four months incarceration prior to starting at Regal.

At his prior theatre, Gadsden had been promoted to the position of "Shift Lead," which was available to selected members of the Floor Staff. A Shift Lead was a senior Floor Staff employee who, besides performing the work of a regular Floor Staff member, helped the theatre manager or assistant managers as directed. When he assumed the Shift Lead position, Gadsden had completed a required program of anti-harassment, discrimination, and retaliation training. Gadsden wore the same uniform as other members of the Floor Staff; Managers and Assistant Managers, in contrast, would wear a sport coat and tie. At times, Gadsden would wear a name tag, as did the entire Floor Staff, except that Gadsden's would say "Shift Leader." Regal eliminated the title of Shift Leader about four months after Gadsden started at Midway, replacing it with the title of "Senior Cast Member," which Gadsden then held.

---

about them. Those characterizations are not admissible evidence and the Court has not considered them. See Bickerstaff v. Vassar College, 196 F.3d 435, 456 (2d Cir. 1999) (a plaintiff's "feelings and perceptions of being discriminated against are not evidence of discrimination.").

According to plaintiff, Gadsden began making off-color remarks to her and asking to go out with her in March and April of 2010; he was not put off by her refusals or her advice to him that she was married.[2] By late April or May, he had become persistent in his requests to go out with her. Nevertheless, on a cold night in April, when the theatre was closing late and plaintiff had missed her bus, she accepted his offer for a ride home. He pressed her to go out with him throughout that ride, and she was equally firm in her refusal. She let him know that although she was going through a difficult divorce, she had no interest in an intimate relationship with him.

Plaintiff tried to have little contact with Gadsden over the next couple of months, and this led to her temporary belief that he understood that she would tolerate nothing more than a friendship. On that basis, she and Gadsden agreed to go together with their respective children to an amusement park out of state and plaintiff offered to pay for gas for the trip. However, plaintiff's son was hospitalized and the trip did not occur.

For the rest of the summer and into September, Gadsden continued his vulgar and aggressive remarks to plaintiff and also combined them with obscene gestures. She continued to reject him. However, he also pressed her to lend him money, and after initially refusing, she agreed. They entered into a written loan agreement on September 23rd by which she advanced him $600; the loan agreement provides that he would repay her $900 by October 20th. Nevertheless, she requested repayment of $200 about 10 days later and $450 a few days after that. Gadsden declined both requests.

In early October, in the employee break room, Gadsden kissed plaintiff and then exposed himself suggestively to her, making the most obscene gestures. Plaintiff was traumatized but again did not report it. Instead, she asked the theatre manager, Nick Green, to rearrange her

---

[2] Because defendants do not dispute the allegations as to Gadsden's conduct for the purposes of this motion, I have not set out those allegations *in hac verba*. It suffices to note that plaintiff's allegations, if true, would constitute a hostile work environment under any definition.

schedule, not telling him the real reason, but instead using her attendance at domestic violence and parenting classes as an excuse. Nevertheless, her schedule and Gadsden's sometimes overlapped, and he continually showed up during her shifts.

On or around October 10th, assistant manager Jane Cinsov saw that plaintiff was nervous around Gadsden and asked plaintiff whether she had a problem with him. At that point, plaintiff described how Gadsden had exposed himself to her and the effect that it had on her. Cinsov was horrified, and when plaintiff expressed reluctance to report it, Cinsov told plaintiff that if plaintiff did not report it to Nick Green, Cinsov would. Plaintiff therefore reported the incident to Green, who immediately spoke to plaintiff and told her to have no further contact with Gadsden or to discuss the matter with other employees. Plaintiff and Gadsden had been scheduled to work together the next day and Green offered to reschedule her, but she declined. Green also obtained a short written statement from plaintiff as to what had transpired.

In that statement, plaintiff stated that Gadsden had "offered a friendly kiss" to her in the break room because he knew she was feeling "overwhelmed with things in my life;" that she had refused; and that in response, he had exposed himself and made obscene gestures and suggestive remarks. She then "walked out in tears and upset my friend would do that."

The next morning, Green opened a reporting line to Regal's Director of Human Relations, Jennifer Jones. Jones opened an incident file and the record is clear that over the next five weeks, Jones was in charge of the investigation and determining how to resolve the incident. She specifically directed Green on how to proceed and Green complied with those directions.

As a first step, Green obtained generically-worded surveys from five randomly selected members of the female Floor Staff who had worked with Gadsden. These surveys, without expressly referring to Gadsden, inquired whether any of these five employees had suffered any

sexual harassment in the workplace; or whether they had been subjected to any "unfair/inappropriate treatment;" or if they had any other "concerns with [their] working environment." All of the surveys came back with uniformly negative responses.

Two days after opening the investigation, Jones informed plaintiff in writing that she was investigating plaintiff's complaint, and that plaintiff could contact her directly if she wished to add any additional information.

On that same day, Gadsden went to Green and advised him that plaintiff had told Gadsden that she was going to file a complaint against him (notwithstanding Green's direction to her that she have no contact with Gadsden). Gadsden denied plaintiff's allegations of harassment and submitted two written statements. He acknowledged kissing plaintiff but denied exposing himself to her, alleged that plaintiff had continued to be friendly with him after he had kissed her, and expressed the belief that plaintiff was angry with him because he was reconciling with his wife.

Approximately one week later, plaintiff again telephoned Gadsden to request repayment of the loan. Gadsden refused, pointing out that they had been directed not to communicate with each other. Plaintiff called Jones the next day to complain that Gadsden had threatened her during that call for having reported him; he had made some reference to his experience in the Army, and she took that as a threat of physical violence. Plaintiff did not tell Jones that she had initiated the call to Gadsden. However, for the first time, plaintiff described for Jones some of the additional inappropriate actions Gadsden had taken towards her since they had both started work at Midway the preceding March.

Jones promptly instructed Green to suspend Gadsden immediately pending the results of the investigation. She also instructed Green, in light of plaintiff's new allegation of a pattern of

harassment rather than a single incident, to expand the pool of those who had received the generic survey to include all female employees.

Gadsden was suspended the next day when he showed up for work. He promptly gave Green his own written statement, in which he denied that he had threatened plaintiff and advised that it was plaintiff who called him, not the reverse. He further explained that he had referred to his Army experience only to show her, when she had pressed him to repay the loan, that he could be counted on to act honorably and repay the money he owed her.

Eleven days later, plaintiff submitted a lengthy written statement at Green and Jones' request that laid out her case against Gadsden. The material parts of this statement are set forth above. Approximately two weeks later, on November 18, 2010, Jones concluded, based on the directly conflicting statements of plaintiff and Gadsden, as well as all of the circumstantial evidence pointing both ways and the lack of corroboration from any other female employees that Gadsden had ever engaged in harassing activity, that she could not reach a definitive determination as to whether plaintiff or Gadsden was telling the truth. However, because of Gadsden's admitted kiss, whether consensual, as he claimed, or not, as plaintiff claimed, violated Regal's policy, a disciplinary violation was placed in his file. In addition, Jones ended Gadsden's suspension and authorized Gadsden to return to work, but only on a separate schedule from plaintiff.

That ended the matter as far as Regal was concerned at the time but it did not solve the problem. The very next day, plaintiff complained to Jones first by telephone and then in a lengthy letter that she was being mistreated by unnamed fellow employees, who snickered at her behind her back, and by management-level employees. As to the latter category, one of them who, according to her, was "trying to make me feel comfortable," mocked Gadsden's heavy-

handed approach to her, portraying Gadsden as a buffoon. Plaintiff reported that she did not think it was funny. Another manager told her young son, who had come into the theatre asking for her, that she had been fired. In addition, plaintiff reported that she had seen Gadsden at the theatre and another manager told her that he was telling fellow employees that he had "won the case." Finally, she complained that another manager had sent her home at 4:30 p.m. instead of 6:00 p.m. on a busy day because, she believed, Gadsden was coming in earlier and they preferred to have his extra hours over her regular hours.

Jones and Green opened another investigation and interviewed each of the managers involved. As to her claim that she had been sent home early to avoid Gadsden, which the manager denied, the schedule and time clock showed that Gadsden was not due to start until 6:30 p.m. and actually arrived at 6:32 p.m. They therefore rejected her claim that she had been sent home early as an accommodation to Gadsden. As to the conversation between the manager and her son, the manager admitted saying that he had told her son that his mother had been fired, but characterized the remark as a running joke that he had used previously with her sons.[3] Both the manager and another employee who witnessed the interaction indicated in written statements that plaintiff's son in fact laughed at the manager's comments, and that plaintiff laughed when she heard about his comments as well. The manager was reprimanded and a note was placed in his file for such "joking." Finally, there is no indication in the record whether any action was taken with regard to the manager who imitated Gadsden. Jones concluded that the events of which plaintiff complained did not constitute harassment or retaliation for plaintiff's complaint.

---

[3] Plaintiff claimed that her son stated that this manager had told him that plaintiff had been fired and that "[t]he police came and dragged [her] out." There is no admissible evidence that the manager made the quoted part of the statement. He admitted only saying that plaintiff no longer worked there, and plaintiff has not submitted an affidavit from her son. Her description of what the manager said to her son is therefore hearsay.

Because plaintiff's unhappiness at that point went beyond Gadsden and included other employees and the managers at Midway, Green suggested to her that she might want to transfer to another theatre temporarily. Plaintiff requested the Union Square theatre and Regal granted her request; she worked there in late December 2010 and early January 2011.

However, towards the end of her second week there, she requested leave because of the emotional trauma caused by the Gadsden incident. Jones advised her that she had not worked long enough to qualify for leave under the Family and Medical Leave Act, but that Regal had a discretionary policy allowing 30 days leave, which she was granted. She applied twice more for this leave, and although Regal's policy allowed only one 30 day leave period, each request was granted. She thus received a total of 90 days' leave. She then contacted the General Manager of the Union Square theatre, advising that she intended to apply for more leave but would like to return to Union Square when that was over. At that point, Regal's benefits department advised her that she had exhausted her personal leave and was being administratively discharged. Nevertheless, she was invited to reapply once she was ready to work and told that she would be hired if a position was available at that time.

Plaintiff brought this action several months later.

## DISCUSSION

To prevail on a motion for summary judgment, the movant must show that the absence of material and genuine factual issues requires judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548 (1986). In evaluating the motion, the court must not "resolve issues of fact but only . . . determine whether there is a genuine triable issue as to a material fact." Howley v. Town of Stratford, 217 F.3d 141, 150 (2d Cir. 2000). The Court must resolve all ambiguities and draw all factual inferences in favor of the non-moving party.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505 (1986). The opposing party, however, "may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." Podell v. Citicorp Diners Club, Inc., 112 F.3d 98, 101 (2d Cir. 1997) (citations and internal quotations marks omitted). Evidentiary submissions relating to a summary judgment motion must adduce facts that would be admissible in evidence. See Fed. R. Civ. P. 56(e).

In an employment discrimination case, a defendant is entitled to summary judgment "unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." Joseph v. Leavitt, 465 F.3d 87, 90 (2d Cir. 2006) (quoting James v. New York Racing Ass'n, 233 F.3d 149, 154 (2d Cir. 2000)). Because "employers are rarely so cooperative as to include a notation in the personnel file that the [adverse employment action] is for a reason expressly forbidden by law," courts should proceed with caution before granting summary judgment to defendants in discrimination cases. See Bickerstaff v. Vassar College, 196 F.3d 435, 448 (2d Cir. 1999) (citation and internal quotation marks omitted). Nevertheless, it "is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001).

## I.      Hostile Work Environment

This case starts at a point many plaintiffs struggle to reach. Defendants effectively do not contest, for the purposes of this motion only, that the conduct that plaintiff ascribes to Gadsden created a hostile work environment.[4] Instead, defendants argue that Regal is not liable because upon receiving notice of the hostile environment, it promptly took appropriate action pursuant to

---

[4] This is one of several points as to which defendants' briefs are confusing. Although the reply brief contains a subpoint titled, "No Reasonable Jury Could Find the Existence of a Hostile Work Environment," the substance of the subpoint has nothing to do with the title. Instead, it argues that the existence and implementation of Regal's anti-discriminatory policy precludes imputation to Regal of the hostile environment that Gadsden created.

an adequately designed and executed anti-harassment policy. This defense turns initially on whether Gadsden is properly characterized as a co-employee of plaintiff or, in contrast, as her supervisor.

### A. Gadsden's Employment Status

"The starting point for analyzing employer vicarious liability in a Title VII hostile work environment action is to determine whether the person who allegedly created that environment is properly characterized as having been the plaintiff's 'supervisor.'" Mack v. Otis Elevator Co., 326 F.3d 116, 123 (2d Cir. 2003). This is because the test for determining whether to impute liability differs when the offender is a co-worker as opposed to a supervisor. "Employers are not . . . vicariously liable for [a] hostile work environment created by a mere co-worker of the victim," id., unless the employer "knew (or reasonably should have known) about the harassment but failed to take appropriate remedial action." Petrosino v. Bell Atl., 385 F.3d 210, 225 (2d Cir. 2004). On the other hand, if the offender is a supervisor and the employee suffered a tangible employment action, like a loss of pay, then "the employer will, *ipso facto*, be vicariously liable." Id. (quoting Mack, 326 F.3d at 124). Even if there was no tangible employment action, the employer will still be liable for the hostile work environment created by the supervisor unless the employer can show affirmatively that it "'exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and, in addition, that the employee unreasonably failed to avail herself of the corrective opportunities that the employer offered. See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765, 118 S. Ct. 2257, 2270 (1998).[5]

---

[5] Although the tests differ when the harassing party is a supervisor or non-supervisor, it seems clear that in cases where there is no tangible employment action, the proof required to establish liability will often overlap. This is because of the similarity between the "appropriate remedial action" required in the case of a non-supervisor and the "prompt correction" of sexually harassing behavior required in the case of a supervisor.

The test for determining whether a particular person is a supervisor is broader in the Second Circuit than in most other circuits.  See Mack, 326 F.3d at 126-27; see generally Courts Split on Definition of 'Supervisor' in Sexual Harassment Cases, 18 No. 26 Andrews Emp't Litig. Rep. 12 (West 2004).  In the Second Circuit, an offender can qualify as a supervisor even if he lacks the authority to make tangible economic decisions concerning the employee.  Drawing, in part, on the Equal Employment Opportunity Commission's definition of supervisor, which includes those who have "authority to direct the employee's daily work activities," EEOC Enforcement Guidance on Vicarious Employer Liability for Unlawful Harassment by Supervisors, 8 FEP Manual (BNA) 405:7654 (1999), the Second Circuit classifies an offender as a supervisor if "the authority given by the employer to the employee enabled or materially augmented the ability of the latter to create a hostile work environment for his or her subordinates."  Mack, 326 F.3d at 126.

In arguing that Gadsden cannot be considered a supervisor, defendants, although citing Mack, rely primarily on the undisputed facts that might be adequate to preclude Gadsden's characterization as a supervisor in circuits other than the Second – that Gadsden could not unilaterally schedule, impose discipline, or hire or fire plaintiff.  Defendants thus initially rely on internal memoranda circulated among its management (but apparently not its Floor Staff), essentially making the point that no one in management should use the word "supervisor" in the same sentence as "Shift Lead."  One such cover memorandum, for example, circulated the "Job Description" for Shift Lead, noting as follows:

> This [attached] correspondence was sent to the field recently to clarify the responsibilities of the Shift Leader position.  It is critically important to understand this position is intended to play an active role in our operations, but they do not have ANY supervisory functions.  To give them supervisory responsibilities would be outside the scope of the Job Description and could

expose us to additional unnecessary liability.

The attached "Job Description," in turn, contains a list of "Essential Duties and Responsibilities" which are either indicative of the need for the Shift Lead to follow management directions, or are internally-focused to promote a positive image for the theatre and other staff. Nothing in the Job Description could be construed as granting Shift Leaders any authority over other members of the Floor Staff. Similarly, when Regal eliminated the Shift Lead position in July, 2010, replacing it with the "Senior Cast Member" title, a memorandum to theatre managers noted that "this position does NOT include any supervisory or management functions."

Defendants also rely on plaintiff's deposition, where she acknowledged that (a) she did not consider Gadsden to be a manager and knew he did not work in the manager's office; (b) she never referred to Gadsden at the theatre as her supervisor; (c) she knew that Gadsden did not set her schedule and could not authorize time off for her; (d) if she asked Gadsden if she could take a break, he would have to clear it with a manager; and (e) Gadsden had the same ability to report her for a disciplinary infraction as she had to report him.

Defendants' points are valid but they focus on Gadsden's ability, or more properly his lack of ability, to impose tangible employment actions on plaintiff, and the <u>Mack</u> definition of supervisor is broader than that. Thus, defendants ignore or downplay an important portion of plaintiff's deposition testimony that tends to show that Gadsden fell within the expanded definition of supervisor under <u>Mack</u>:

> Q: Did you report to [Gadsden]?
> A: Report to him how?
> Q: In any way.
> A: Well, if he told me to go on a break, I was, you know, mandated to go on break. And if he told me to clean, I cleaned.
> Q: So your testimony is that Mr. Gadsden had the authority to tell you to go on break and to clean; is that correct?

> A: I'm unsure of the guidelines of what a shift lead/supervisor is, because I was
> just a regular cashier, but if he told me to go on break, I listened. If he asked me
> to help clean a theater, I did it.

Read liberally, this testimony could support a conclusion that Gadsden had "authority to direct

the employee's daily work activities," see EEOC Enforcement Guidance, supra, one aspect of the

definition of supervisor that the Second Circuit approved in Mack.

    I recognize that this testimony is quite thin. It is unclear whether plaintiff was describing

a standard operating procedure in which Gadsden regularly directed her as to when to take

breaks and when to clean a theatre, as opposed to, for example, one co-worker helping another

on isolated occasions or occasionally suggesting that they take a break together. It would have

been easy enough, if the facts supported it, for plaintiff to have submitted an affidavit in

opposition to the instant motion in which she detailed the number, type, and frequency of tasks

of this nature to which Gadsden assigned her. The failure to provide more details concerning

plaintiff's above-quoted testimony brings that testimony perilously close to the kind of

conclusory assertions that generally do not raise an issue of fact sufficient to defeat a motion for

summary judgment. See FDIC v. Great Am. Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010);

Shannon v. N.Y.C. Transit Auth., 332 F.3d 95, 99 (2d Cir. 2003).

    Nevertheless, I conclude that the problem is ultimately defendants', not plaintiff's,

because it is defendants' burden to show that there are no disputed issues of fact, and I have to

construe the evidence in the light most favorable to plaintiff. Just as plaintiff could have filled

out the record with an affidavit describing in more detail what she meant by her testimony,

nothing prevented defendants when she gave that testimony from following up and asking her

how often and on what occasions Gadsden gave her such directions. Alternatively, defendants

could have submitted an affidavit from Gadsden in support of the motion that responded to this

testimony, stating, for example (if the facts supported it), that he only occasionally asked plaintiff to help out with particular tasks, and in which he could have described his day-to-day interaction with plaintiff.

In the absence of evidence sufficient to conclusively demonstrate the nature of the work relationship between plaintiff and Gadsden, I cannot hold as a matter of law that Gadsden was not plaintiff's supervisor as that term has been broadly defined by the Second Circuit.

## B. Faragher/Ellerth Affirmative Defense

Even if Gadsden was plaintiff's supervisor, that does not end the inquiry. As noted above, an employer is liable *ipso facto* for its supervisor's sexual harassment only if that harassment took the form of a tangible employment action. See Ellerth, 524 U.S. at 765, 118 S. Ct. at 2270. There is no tangible employment action here; this is a "pure" hostile work environment case. Cf. Pa. State Police v. Suders, 542 U.S. 129, 148, 124 S. Ct. 2342, 2355 (2004) (constructive discharge not a tangible employment action when the offending supervisor took no official act against the plaintiff); Caridad v. Metro North Railroad, 191 F.3d 283, 294 (2d Cir. 1999) (constructive discharge not a tangible employment action). This means that defendants have available to them the two-prong affirmative Faragher/Ellerth defense, based on the Supreme Court's decisions in Faragher v. City of Boca Raton, 524 U.S. 775, 118 S. Ct. 2275 (1998), and Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 118 S. Ct. 2257 (1998).[6]

---

[6] Curiously, defendants cite to Faragher and Ellerth but do not expressly rely on the affirmative defense that those cases created. Instead, defendants rely on earlier Second Circuit cases like Karibian v. Columbia University, 14 F.3d 773 (2d Cir.1993), and Kotcher v. Rosa & Sullivan Appliance Ctr., Inc., 957 F.2d 59 (2d Cir. 1992). These cases anticipate some of the concepts that the Supreme Court ultimately adopted in Faragher and Ellerth, but the more recent Supreme Court cases provide the analytical framework for determining whether to impute supervisor conduct to the employer. See Celestino v. Montauk Club, No. 97 CV 3943, 2000 U.S. Dist. LEXIS 21845, at *59 n.20 (E.D.N.Y. Feb. 13, 2002) (noting that prior to Ellerth and Faragher, the Second Circuit applied a differently formulated test to determine imputation). Nevertheless, defendants have addressed the two-part test under Faragher/Ellerth, even without referring to it as such, and I therefore find that it has been properly raised.

### 1) Prong One

Under the first prong of the Faragher/Ellerth defense, a defendant-employer must

establish that it exercised "reasonable care in preventing and correcting any sexually harassing

behavior." See Ellerth, 524 U.S. at 765, 118 S. Ct. at 2270. To meet this burden, an employer is

not required to prove success in preventing harassing behavior. See Caridad, 191 F.3d at 295. In

addition, substantial weight is placed on the existence of an adequate anti-harassment policy and

the promulgation of reporting procedures. See id. ("Although not necessarily dispositive, the

existence of an anti-harassment policy with complaint procedures is an important consideration

in determining whether the employer has satisfied the first prong of this defense.").

Applying this standard, I can find no fault either with Regal's anti-harassment policy or

its implementation of that policy on the facts of this case. The policy itself is the kind of lawyer-

designed program commonly seen at substantial U.S. enterprises. It protects the employer from

liability by seeking to protect employees from sexual harassment. It requires training of

supervisors to recognize and prevent illegal discrimination and sexual harassment.[7]  In plain

language and in the strongest possible terms, the policy states that sexual harassment is

prohibited; it gives numerous examples to illustrate what constitutes sexual harassment, many of

which encompass the conduct that plaintiff ascribes to Gadsden; it mandates supervisor

responsibility through specific steps once a supervisor becomes aware of sexual harassment; it

establishes a reporting line for the victimized employee that starts with the employee's

immediate supervisor but provides alternatives in case the supervisor is the offender; and it

provides a hotline for employees to use in the event they wish to make an anonymous complaint.

In addition, it requires each employee to confirm in writing, at the commencement of her

---

[7] Interestingly, Gadsden, as a Shift Lead, received this management level training, unlike other members of the Floor Staff. Although plaintiff has not pointed to this fact, it somewhat undercuts Regal's argument that Gadsden and other Shift Leaders were not supervisors.

employment, that she has reviewed the employee handbook that contains the policy, which plaintiff did here.

The availability of the hotline is noteworthy because this was not the first time that plaintiff alleged harassment against a Regal employee. Prior to her transfer to Midway, but about a month after she had received a third-step (out of four) disciplinary warning, plaintiff called the hotline to report some form of harassment by a manager at her prior theatre. The record does not disclose the details of that complaint, but it does disclose that she used the hotline to make a complaint; it was investigated by Regal's human resources department; and it was resolved, apparently to her satisfaction, by mandating that the manager and plaintiff be placed on different schedules.[8]

This, in turn, defeats one of plaintiff's criticisms of Regal's anti-harassment policy, which is that although she does not deny signing the acknowledgement, she does not recall it. She therefore asserts that she was inadequately advised of or trained in connection with the policy. But she had already used the hotline just over a year before Gadsden allegedly began to harass her. She obviously knew enough to have picked up the phone again to make another call, which is all that she had to do under Regal's policy. And although, as is common in these kinds of cases, plaintiff professes reluctance to have triggered the complaint system a second time out of fear of adverse consequences, the case law is clear that such reluctance, while understandable, does not suggest any impairment in the quality of the employer's policy and complaint procedures. Rather, such a fear can only lead to employer liability if there is objective evidence that the plaintiff would suffer retaliation or that her complaint would not be taken seriously. See

---

[8] It was about a month later, when plaintiff had received her fourth-step disciplinary warning, that she requested and received a transfer to Midway.

<u>Leopold v. Baccarat, Inc.</u>, 239 F.3d 243, 246 (2d Cir. 2001); <u>Caridad</u>, 191 F.3d at 295. There is no such evidence here.

Further, plaintiff has cited no authority, and I have found none, requiring an employer to orally walk each new employee through its anti-harassment policy before the employee signs it as if it were a Miranda warning, or requiring the employer to provide any particular anti-harassment training exercises if the policy is clear on its face. Regal's policy is clear, plaintiff signed it, she had previously utilized it, and she has not asserted that anything in her prior experience made her believe that following the procedure would be ineffective or harmful to her employment.

I also do not see how Regal could have responded more appropriately than it did once plaintiff, at Cinsov's urging, finally came forward with her complaint. The procedure was activated immediately. Green followed the policy, coordinated with Jones, solicited potential witness statements, obtained statements from plaintiff and Gadsden, temporarily suspended Gadsden, and reached a final resolution that disciplined Gadsden and separated the two of them. Although the five week period that it took to conclude the investigation might be a bit long in some cases, <u>see</u> <u>Howley</u>, 217 F.3d at 156 (five weeks of inactivity too long where multiple witnesses had observed, and offender admitted, offensive conduct), it must be remembered that in the present case plaintiff did not disclose Gadsden's pattern of harassment – as opposed to the single precipitating event in the break room – until nearly two weeks after her initial complaint, and she then took another twelve days to type up a comprehensive statement that described her experiences.

Plaintiff's remaining criticisms of Regal's response are also insubstantial. She first notes that Jones was in Tennessee and argues that this resulted in "a well-documented but entirely

unreasonable response" to plaintiff's complaint.  Plaintiff is right that the communications

between Green and Jones are well-documented, but email travels just as fast from the Midway

theater to Tennessee as it would have traveled from the Midway theatre to an office in Times

Square.  Title VII does not require a company with multiple outlets to keep a human resource

manager in addition to an operations manager at every location.

Plaintiff also complains that the generic surveys given to female employees did not single

out Gadsden and ask whether any other employees had experienced a problem with him

specifically.  But in a situation of uncorroborated and conflicting allegations, as Regal faced

here, the reason for using generic surveys is obvious and quite proper.  Asking every female

employee whether she had a problem with Gadsden would be tantamount to telling every female

employee that there was a problem with Gadsden.  Regal had not reached a determination that it

was appropriate to create a negative impression of Gadsden among his co-workers where one

might not have existed.

Plaintiff's final challenge is that Regal's response to her complaints was not reasonable

because the remedy Regal imposed did not work to her satisfaction.  The argument is based on

the working environment that plaintiff perceived after the investigation was concluded, the fact

that Gadsden was disciplined but reinstated, and that the two of them were scheduled to work at

different times.  This argument overlaps entirely with her claim of retaliation, discussed below.

Conspicuously absent from plaintiff's argument, however, is any suggestion as to what

more Regal should have done.  Although plaintiff's submission to Jones describing this post-

solution environment was lengthy, it only described three specific incidents – her opinion that

she been told not to work for 1½ hours to avoid Gadsden; the remark to her son by another

manager; and the insulting caricature of Gadsden attempted by another manager.  Jones and

Green investigated the time allegation and the documentary evidence showed that there was simply no basis for plaintiff's opinion that her time had been reduced to accommodate Gadsden. They imposed a disciplinary sanction against the manager who made a misplaced attempt at humor with her son. The record does not show any action with regard to the manager who imitated Gadsden, but as plaintiff herself said in her complaint about it, she considered that manager "a really good person and a good manager but one day he made the mistake of trying to make me feel comfortable" by imitating Gadsden in a way that made Gadsden look like a fool. No reasonable jury could conclude that Regal was required to take action as to that or that there was any retaliatory intent behind the manager's action. Further, although plaintiff complained to Regal that "people are treating me differently," she gave Regal no specifics other than the three incidents described above and Gadsden's empty boasting, and in this case, points to no further action that Regal should have taken.

But Regal, in fact, did more. Since plaintiff's post-solution complaint made it clear that she was horribly uncomfortable working at Midway, it offered her at least a temporary transfer to the Union Square theatre, which she accepted. Plaintiff does not allege that the atmosphere at Union Square was hostile, or that there was any other problem there. Indeed, after receiving 90 days of leave, plaintiff expressed a desire to go back to Union Square at some undefined point in the future. Her claim thus devolves into an implicit assertion that Regal had an obligation to either keep the spot at Union Square open for what would have been a clearly lengthy and possibly unlimited period (she had already taken 90 days of leave, which was 60 days in excess of Regal's policy), or to pay her damages because it was strictly liable for Gadsden's misconduct. Title VII did not require Regal to take either of those courses.

### 2) **Prong Two**

Having concluded that Regal had an appropriate anti-harassment policy that it reasonably implemented in this case, the remaining issue is whether it must establish anything else in order to be entitled to summary judgment on plaintiff's claim for hostile work environment. Although the Faragher/Ellerth defense includes a second prong – "that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise," Ellerth, 524 U.S. at 765, 118 S. Ct. at 2270, I believe that in this case the answer is no.

The express purpose of the Faragher/Ellerth defense is to incentivize both employers and employees to work towards preventing and minimizing the harm caused by sexual harassment. See Ellerth, 542 U.S. at 764-65, 118 S. Ct. at 2270; Faragher, 524 U.S. at 805-807, 118 S. Ct. at 2292. Thus, employers must make reasonable efforts to both thwart and remedy hostile work environments, and employees risk being barred from asserting their claim if they unreasonably fail to mitigate harm. However, the facts of this case provide a compelling example of why it cannot be necessary in all circumstances for an employer to establish unreasonable conduct on the part of the employee in order to avoid vicarious liability. Here, Regal adopted appropriate training and reporting procedures, plaintiff complied with those procedures for the most part, and Regal remedied the hostile work environment accordingly. In other words, the incentives provided by the Faragher/Ellerth defense worked exactly as they were supposed to. See Faragher, 524 U.S. at 806, 118 S. Ct. at 2292 (recognizing in formulating defense that Title VII's "'primary objective,' like that of any statute meant to influence primary conduct, is not to provide redress but to avoid harm"); Ellerth, 524 U.S. at 764, 118 S. Ct. at 2270 (relying on "Congress' intention to promote conciliation rather than litigation in the Title VII context"). In

such a case, I see no reason why an employer should be held vicariously liable for a hostile work environment solely because the employee reported it, and I do not believe Faragher or Ellerth dictate otherwise. See Faragher, 524 U.S. at 806, 118 S. Ct. at 2292 (noting "clear statutory policy . . . to recognize the employer's affirmative obligation to prevent violations and give credit here to employers who make reasonable efforts to discharge their duty").[9]

Instead, a close reading of those decisions indicates that the Faragher/Ellerth defense was created primarily to address and determine who is to blame for a continued hostile work environment rather than initial instances of harassment. Thus, the employer that adopts appropriate training and reporting procedures is not required to successfully prevent harassing behavior under prong one, but must take reasonable steps to promptly correct a hostile environment once the employer has knowledge of its existence. See Faragher, 524 U.S. at 806-07, 118 S. Ct. at 2292; Leopold, 239 F.3d at 245; Caridad, 191 F.3d at 295. Prong two, in turn, addresses the employee's conduct once the harassing behavior has begun, and adopts from the general theory of damages the principle that an employee should not recover for harm that could have been avoided had she reported the misconduct. See Faragher, 524 U.S. at 806-07, 118 S. Ct. at 2292. However, in this case, the hostile work environment created by Gadsden predated plaintiff's complaints and ceased once Regal's anti-harassment procedures were triggered. Regal promptly and appropriately remedied the problem, and therefore there was no future sexual harassment from Gadsden for plaintiff to avoid. For this reason, Regal is not required to establish the second prong of the Faragher/Ellerth defense in this case, and it is not strictly liable

---

[9] The contrary holding would impose strict liability for any hostile work environment created by a supervisor if the employee reasonably complied with the complaint procedure in place. However, such a standard is inconsistent with the purpose of both the Faragher/Ellerth defense and Title VII, as noted above. Further, the employer who corrects a hostile work environment as soon as it becomes aware of its existence has no more culpability, and arguably less, than the employer who is never notified by the employee of the harassment in the first place. Holding the former employer vicariously liable is therefore not logical.

for the alleged hostile work environment merely because plaintiff reported the sexual harassment.

In any event, I further find that plaintiff's failure to accept the Union Square position within any reasonable time satisfies Regal's burden under the second prong of the Faragher/Ellerth defense. As I alluded to above, this element is typically satisfied by demonstrating a plaintiff's failure to file or at least to timely file a complaint, which plaintiff complied with here. See Ellerth, 524 U.S. at 765, 118 S. Ct. at 2270 (holding that while not required, "any unreasonable failure to use any complaint procedure . . . will normally suffice to satisfy the employer's burden under the second element of the defense"); see also, e.g., Gorzynski v. JetBlue Airways Corp., 696 F.3d 93, 104-05 (2d Cir. 2010) (analyzing whether plaintiff failed to properly report harassment); Ferraro v. Kellwod Co., 440 F.3d 96, 101 (2d Cir. 2006) (analyzing whether plaintiff's failure to take advantage of complaint procedure was justified). But I think it is equally applicable where an employer provides a reasonable solution pursuant to its complaint procedure and the employee, although agreeing that it is satisfactory, simply declines to accept the solution. In such a situation, a plaintiff has "unreasonably failed to take advantage of the corrective opportunities provided by the employer," Ellerth, 524 U.S. at 765, 118 S. Ct. at 2270, and therefore may not seek to hold an employer vicariously liable for hostile work environment.

By quickly and thoroughly investigating the problem and then proposing a solution to which plaintiff seemed agreeable, Regal has satisfied the Faragher/Ellerth defense. No reasonable juror could conclude otherwise, and Gadsden's offensive behavior therefore cannot be imputed to Regal.

## II.     Plaintiff's Claim for Retaliatory Hostile Work Environment

An employer may not retaliate against an employee for opposing a practice made unlawful by Title VII. See 42 U.S.C. § 2000e-3(a); Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53, 59-60, 126 S. Ct. 2405, 2410 (2006); Townsend v. Benjamin Enters., Inc., No. 09-0197-cv, 2012 U.S. App. LEXIS 9441 (2d Cir. May 9, 2012).  To establish a prima facie claim of unlawful retaliation, a plaintiff must show: (1) that she participated in protected activity; (2) that the employer-defendant was aware of the protected activity; (3) that she suffered an adverse employment action; and (4) that there existed a causal connection between the adverse action and the employee-plaintiff's protected activity.  See Tepperwein v. Entergy Nuclear Operations, Inc., 663 F.3d 556, 558 n.6 (2d Cir. 2011); Hicks v. Baines, 593 F.3d 159, 164 (2d Cir. 2010).  The Supreme Court has held that an adverse employment action must be "materially adverse" in that it would "dissuade[ ] a reasonable worker from making or supporting a charge of discrimination." White, 543 U.S. at 68, 126 S. Ct. at 2415 (2006).[10]  Material adversity must be the focus in determining whether an adverse employment action has occurred because "it is important to separate significant from trivial harms."  Id.

Plaintiff contends that she suffered retaliation by way of the hostile work environment that she was forced to endure after her complaint against Gadsden had been resolved by Regal. Nearly every decision to address a claim for retaliatory hostile work environment has held that a plaintiff must satisfy the same standard used to evaluate conventional hostile work environment claims; that is, the incidents of harassment following a complaint were sufficiently continuous

---

[10] The Supreme Court further clarified in White that a materially adverse action in the Title VII retaliation context need not be "workplace-related or employment-related." See White, 548 U.S. at 67, 126 S. Ct. at 2414. Nevertheless, the Second Circuit has continued to include "adverse employment action" as an element of a claim for retaliation under Title VII.  While district courts have questioned whether this is technically accurate after White, see Thomas v. iStar Fin., Inc., 438 F. Supp. 2d 348, 364 (S.D.N.Y. 2006), the issue is not relevant to this decision, as plaintiff has asserted that the retaliation she suffered occurred in the context her employment.

and severe to have altered the conditions of employment. See, e.g., Sclafani v. PC Richard & Son, 668 F. Supp. 2d 423, 438 (E.D.N.Y. 2009); Rasco v. BT Radianz, No. 05 Civ. 7147, 2009 U.S. Dist. LEXIS 21540, at *47 (S.D.N.Y. Mar. 17, 2009). On the other hand, certain decisions have relied upon the Supreme Court's holding in White that a plaintiff asserting an ordinary retaliation claim must only show a "materially adverse action" rather than an "adverse employment action," and have questioned, without deciding, whether the burden in asserting a claim for retaliatory hostile work environment has necessarily been lowered. See Drees v. County of Suffolk, No. 06-CV-3298, 2009 U.S. Dist. LEXIS 27346, at *29 n.5 (E.D.N.Y. Mar. 30, 2009); Khan v. HIP Centralized Laboratory Services, Inc., No. CV-03-2411, 2007 U.S. Dist. LEXIS 23721, at *35-36 (E.D.N.Y. Mar. 30, 2007).

I previously declined to read White so expansively in Ezuma v. City Univ. of N.Y., 665 F. Supp. 2d 116, 126 (E.D.N.Y. 2009), aff'd, 367 Fed. App'x 178 (2d Cir. 2010), and I do so again here for the reasons articulated in that decision. Specifically, the Supreme Court provided no indication in White that it intended to expand the reach of the judicially-created claim of retaliatory hostile work environment in addition to lowering the burden of making out a claim based on the retaliatory acts of an employer.

In any event, the possibility of a relaxed standard is not critical to the disposition of this summary judgment motion. Under both the traditional hostile work environment test and the materially adverse standard outlined in White, plaintiff's claim of retaliation fails.

The incidents plaintiff alleges that occurred after Regal suspended Gadsden and separated them were neither sufficiently continuous and severe to have altered the conditions of her employment, nor would they dissuade a reasonable employee in plaintiff's position from having reported conduct as egregious as that of Gadsden. The limited incidents upon which plaintiff

relies – hearsay about one incident where Gadsden gloated; one manager's remark to plaintiff's son that plaintiff had been fired; a perceived, but incorrect believe on plaintiff's part that she had been sent home 1½ hours early so that she would avoid Gadsden; and another manager's good-natured but misplaced effort (which is the way plaintiff characterized it) to make plaintiff feel better by mocking Gadsden – coupled with a general allegation that employees treated her differently, do not constitute, separately or together, a hostile work environment. Cf. Kaytor v. Elec. Boat Corp., 609 F.3d 537 (2d Cir. 2010) (retaliatory hostile work environment found where plaintiff produced evidence that she was demoted, placed in an office containing health hazards, repeatedly summoned by human resources to superfluous meetings, was given no work to do, was constantly yelled at by her new supervisor, and was ostracized). They also cannot be considered materially adverse. Rather, the conduct is more akin to the "petty slights or minor annoyances that often take place and that all employees experience." White, 548 U.S. at 68, 126 S. Ct. at 2415. Moreover, although the "materially adverse" test is objective, it is of course relevant that plaintiff was not deterred from complaining about these work conditions, see Tepperwein, 663 F.3d at 572 (2d Cir. 2011), which conditions were far less severe than the alleged sexual harassment that she suffered while working with Gadsden. Thus, no rationale jury could conclude that Regal is liable for retaliatory hostile work environment.

## III. Plaintiff's Claim for Constructive Discharge

Plaintiff alleges that the same incidents that give rise to her retaliatory hostile work environment claim also constitute a constructive discharge. As the Supreme Court has noted, a constructive discharge claim under Title VII is a form of hostile work environment claim:

> The constructive discharge . . . can be regarded as an aggravated case of[] sexual harassment or hostile work environment. For an atmosphere of sexual harassment or hostility to be actionable . . . the offending behavior must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an

> abusive working environment. A hostile-environment constructive discharge
> claim entails something more: A plaintiff who advances such a compound claim
> must show working conditions so intolerable that a reasonable person would have
> felt compelled to resign.

Suders, 542 U.S. at 146-147, 124 S. Ct. at 2354 (citations and internal quotation marks omitted).

As noted above, the limited incidents upon which plaintiff relies are not severe enough to

constitute a hostile work environment. It follows *ipso facto* from the Supreme Court's

description that this conduct is not nearly so intolerable as to constitute a constructive discharge.

Even if it did, Suders makes it clear that the Faragher/Ellerth defense is fully applicable

to a claim of constructive discharge like the one plaintiff raises here. See Suders, 542 U.S. at

148-49, 124 S. Ct. at 2355; Ferraro, 440 F.3d at 101. Regal's adequately designed and

implemented policy, and plaintiff's failure to follow through on the solution to which she

initially agreed, satisfies Regal's burden.

**IV.    State Law Claims**

Plaintiff has also alleged various state and local statutory and common law claims against

Gadsden and Regal. The Judicial Code states that a district court "may decline to exercise

supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed

all claims over which it has original jurisdiction . . ." 28 U.S.C. § 1367(c)(3). Although

§ 1367(c)(3) is couched in permissive terms, the Second Circuit has made clear that the Court's

discretion "is not boundless." See Valencia ex rel. Franco v. Lee, 316 F.3d 299, 305 (2d Cir.

2003). "In deciding whether to exercise jurisdiction over supplemental state-law claims, district

courts balance the values of judicial economy, convenience, fairness, and comity – the 'Cohill

factors.'" Klein & Co. Futures, Inc. v. Bd. of Trade of City of N.Y., 464 F.3d 255, 262 (2d Cir.

2006) (citing Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350, 108 S. Ct. 614, 619 (1988)).

"[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of

factors to be considered under the pendent jurisdiction doctrine . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." Cohill, 484 U.S. at 350 n.7, 108 S. Ct. at 619 n.7. For this reason, district courts within this circuit frequently decline to exercise supplemental jurisdiction over a plaintiff's state law claims arising from the same acts as her federal discrimination claims. See, e.g., Mabry v. Neighborhood Defender Serv., 769 F. Supp. 2d 381, 402 (S.D.N.Y. 2011); Burchette v. Abercrombie & Fitch Stores, Inc., No. 08 Civ. 8786, 2010 U.S. Dist. LEXIS 47043, at *36 (S.D.N.Y. May 10, 2010). The Court sees no reason to depart from this practice as none of the Cohill factors support retaining jurisdiction.[11]

## CONCLUSION

Defendants' motion for summary judgment is granted. Plaintiff's federal claims are dismissed with prejudice and her state law claims are dismissed without prejudice. The Clerk is directed to enter judgment accordingly.

**SO ORDERED.**

s/ BMC
_____
U.S.D.J.

Dated: Brooklyn, New York
       May 31, 2012

---

[11] Although this Court's ruling on the Faragher/Ellerth defense may preclude plaintiff's claim against Regal under New York Executive Law § 296, it does not preclude that claim under New York City law. See Zakrzewska v. New School, 14 N.Y.3d 469, 479, 902 N.Y.S.2d 838, 842 (N.Y. 2010) (Faragher/Ellerth defense is not available under Administrative Code of City of New York § 8–107[1]).