UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| VERONICA CAJAMARCA,<br><br>                                 Plaintiff,<br><br>-against-<br><br>REGAL   ENTERTAINMENT   GROUP   and<br>OTIS GADSDEN,<br><br>                                 Defendants. | CV 11-2780 (BMC) |

**MEMORANDUM IN SUPPORT OF MOTION FOR ATTORNEYS FEES, COSTS AND SANCTIONS**

**Barton LLP**
420 Lexington Avenue
New York, New York 10170
*Tel.:* (212) 687 – 6262
*Fax.:* (212) 687 – 3668
*Attorneys for Defendants Regal*
*Entertainment Group and Otis Gadsden*

July 12, 2012

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................... 1

INTRODUCTION ........................................................................................................... 1

FACTS ............................................................................................................................ 3

1.    Plaintiff's Counsel's Failure to Institute A Litigation Hold ............................ 3

2.    The Break Room Incident—The Cornerstone of Plaintiff's Case, Could Not Have
Occurred At The Time Alleged by Plaintiff ............................................................ 5

3.    Cajamarca's Claims of Damages and Post Traumatic Stress Disorder Constituted A
Fraud on the Court ................................................................................................ 8

4.    Plaintiff's Counsel Should Have Known That Regal Behaved Reasonably in Its
Investigation and Subsequent Treatment of Plaintiff Cajamarca ............................ 13

ARGUMENT ................................................................................................................. 16

I.    Plaintiff Should Be Required To Pay Defendants' Attorneys Fees Under Title VII .... 16

II.    Plaintiff's Counsel Should Be Sanctioned Under FRCP Rule 11 ................................. 18

III.   Defendants Are Entitled To Recover For Excessive Costs Under 28 U.S.C §1927 ...... 20

CONCLUSION .............................................................................................................. 24

# TABLE OF AUTHORITIES

## Cases

*ATSI Commnicatins, Inc.  v. The Shaar Fund, Ltd.*, 579 F.3d 143 (2d Cir. 2009); ....................................................18

*Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006)............................................................15

*Carrion v. Yeshiva University*, 535 F.2d 722 (2d Cir. 1976)...................................................................................17

*Christianburg Garment Co. v. Equal Employment Opportunity Commission*, 434 U.S. 412 (1978)........................16

*Derechin v. State University of New York*, 963 F.2d 513 (2d Cir. 1992) ..................................................................18

*Enmon v. Prospect Capital Corp.,* 675 F.3d 138 (2d Cir. 2012) .............................................................................20

*In re Pennie & Edmonds LLP*, 323 F.3d 86 (2d Cir. 2003)......................................................................................18

*People of the State of New York v. Operation Rescue Nat'l*, 80 F.3d 64 (2d Cir.1996) ............................................20

*Schlaifer Nance & Co., Inc. v. Estate of Warhol*, 194 F.3d 323 (1999) ..................................................................20

*Sierra Club v. United States Army Corps of Eng'rs*, 776 F.2d 383 (2d Cir. 1985) ..................................................20

*Ted Lapidus S.A. v. Vann*, 112 F.3d 91 (2d Cir. 1997).............................................................................................18

*Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212 (S.D.N.Y. 2003)............................................................................3

## Rules

28 U.S. C. § 1927 ................................................................................................................................................1, 23

42 U.S.C. § 2000e-5(k) .........................................................................................................................................16

Fed. R. Civ. P. 11 ..................................................................................................................................................23

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

VERONICA CAJAMARCA,

              Plaintiff,

-against-

REGAL ENTERTAINMENT GROUP and
OTIS GADSDEN,

              Defendants.

CV 11-2780 (BMC)

**MEMORANDUM IN SUPPORT OF
MOTION FOR ATTORNEYS FEES,
COSTS AND SANCTIONS**

## PRELIMINARY STATEMENT

On May 31, 2012, this Court granted defendants' motion for summary judgment in this Title VII Action, dismissing the Federal claims with prejudice and the pendant claims without prejudice. (Ross Aff. Ex. 1)[1] Plaintiff has not appealed. Defendants now request that this Court award (a) attorneys fees against plaintiff on the ground that defendants are the prevailing party in the Federal Title VII claims, and (b) sanctions and attorneys fees against plaintiff's counsel on the grounds that their bad faith pursuit of this case violated Rule 11, Fed. R. Civ. P., and 28 U.S.C. § 1927.

## INTRODUCTION

Plaintiff's counsel may have had a good faith basis for instituting this law suit. But at an early stage of this litigation, defendants' counsel warned plaintiff's counsel---and informed this Court, that plaintiff's pursuit of this case may violate Rule 11, Fed. R. Civ. P., and that plaintiff's allegations of injury and damages may constitute a fraud (Ross Aff. Ex. 2). Defendants' counsel informed the Court that their preliminary investigation determined that plaintiff's social

---

[1] References to "Ross Aff. Ex" are to exhibits attached to the accompanying Affidavit of Maurice N. Ross in Support of Defendants' Motion for Attorneys Fees, Costs and Sanctions.

networking activities belied plaintiff's claim that she suffered from debilitating, career ending, Post Traumatic Stress Disorder ("PTSD"), that she was disabled and unable to work, and that she was bed-ridden and in a "vegetative" state. We further informed the Court that our preliminary investigation had already revealed that many of plaintiff's specific allegations against defendants were obviously incorrect and/or seriously misleading, and we requested that that the Court grant defendants leave to conduct discovery concerning plaintiff's social networking activities, e-mails, and other electronic communications. The Court granted defendants' request and ordered plaintiff and her counsel to cooperate in providing such discovery. The discovery process confirmed that plaintiff's pursuit of this claim violated Rule 11 and that plaintiff's damages allegations were a fraud on the Court.

By the time defendants deposed plaintiff, plaintiff's counsel knew, or should have known, that plaintiff's claims were baseless, that plaintiff had perjured herself in her deposition, and that plaintiff's damages allegations were fraudulent. Yet plaintiff's counsel insisted on pursuing this case to completion. Perhaps most troubling of all, the discovery process revealed that: (a) plaintiff deliberately deleted from her computer thousands of potentially relevant files on the eve of examination of plaintiff's computer by defendants' technical forensic computer experts, and (b) plaintiff's counsel never placed a "litigation hold" in this case, never instructed plaintiff that she had a duty to preserve relevant evidence, and never took any independent steps to assure that relevant and material information was preserved. As we demonstrate below, so serious is the misconduct of plaintiff and her counsel, that this Court should issue an order holding both plaintiff and her counsel jointly and severally liable for defendants' costs and attorneys fees in this matter.

## FACTS

### 1.  **Plaintiff's Counsel's Failure to Institute A Litigation Hold**

Counsel in Title VII cases, no less than counsel in any other case, have an independent duty to enforce a "litigation hold" even before a law suit is commenced if litigation seems reasonably likely to occur. *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003). By the very nature of the allegations in plaintiff's complaint, it should have been obvious to plaintiff's counsel even before the law suit was instituted that (a) text-messages, e-mails and other communications between plaintiff and defendant Gadsden would be of potential critical relevance to assessing the credibility of plaintiff's allegations, and (b)  plaintiff's assertion that she suffered from debilitating trauma would necessitate reasonably extensive discovery concerning plaintiff's social and personal interactions and social networking activities (Ross Aff. Ex. 3).

In fact, however, plaintiff's counsel never instituted a litigation hold and never instructed plaintiff that she had a duty to preserve her electronic records.  This became clear during plaintiff's deposition during which she admitted that (a) on the day before she turned over her computer and cell telephones to defendants for inspection by their technical computer consultants, she intentionally deleted thousands of files from her computer (Ross Aff. Ex. 4 p. 115-116), and (b) plaintiff's counsel never instructed plaintiff that she had an obligation to preserve potentially relevant records in her possession, including records on her personal computers and cell telephones (Ross Aff. Ex. 4 p.119). Plaintiff testified that at no time prior to her deposition did plaintiff's counsel inform her that she had a duty to preserve relevant documents and information (Ross Aff. Ex. 4 p. 110).

Plaintiff's attorneys should have been aware of the need to preserve plaintiff's electronic files, the risks inherent in not explaining this to their client, and the critically important steps they needed to undertake in order to mitigate such risks. However, plaintiff's counsel did not undertake any particularized effort to explain to plaintiff the steps she needed to take to preserve her files, and plaintiff remained unaware of her duty to preserve this information. When asked during her deposition why she destroyed potentially valuable discovery materials, plaintiff Cajamarca stated that she "was unaware" that she had a duty to keep those e-mails and text messages (Ross Aff. Ex. 4 p. 110). Cajamarca offered several different explanations as to why she deleted these files, such as her desire to both remove "ditty pictures [sic]" and an effort to reboot the computer so that it would work properly (Ross Aff. Ex. 4 p. 113). Most importantly, however, she admitted that at no point did she receive any instructions from her attorneys that she was required to preserve her electronic files.

Likewise, plaintiff was never told by counsel that she should preserve text messages, e-mails and other communications with defendants that were stored on her cell-telephones. Yet it was undisputed that plaintiff and defendant Gadsden communicated with each other at critical times via text messages (Ross Aff. Ex. 5). Some of these text messages were produced by plaintiff during the discovery process, but many others were deleted by plaintiff and were never disclosed or produced. Plaintiff admitted during her deposition that at one point she deleted all of the contents of her cell phone and was only able to recover the few files that were saved as backups (Ross Aff. Ex. 4 p. 120). Neither plaintiff nor plaintiff's counsel took any steps to preserve her cell-phone or transfer the data thereon to another device so that it could be preserved.

The failure by plaintiff's counsel to implement a litigation hold and preserve obviously relevant evidence was inexcusable, and this failure unreasonably and vexatiously multiplied these proceedings, requiring defendants to retain specialized computer forensic experts in an effort to retrieve the deleted files. In the circumstances of this case, the only inference that can be drawn is that plaintiff's counsel engaged in bad faith when they failed to take reasonable steps to preserve obviously relevant documents and information.

## 2. The Break Room Incident—The Cornerstone of Plaintiff's Case, Could Not Have Occurred At The Time Alleged by Plaintiff

At the core of plaintiff's case was the allegation that in late September, 2010, she was assaulted and harassed by defendant Gadsden in an employee break room (Ross Aff. Ex. 6 p. 6-7). According to plaintiff, this was the culmination of a long series of events in which she was harassed by Gadsden (Ross Aff. Ex. 6 p. 3-8), who she alleges to have been her supervisor (Ross Aff. Ex. 4 p. 136-137). The timing of this incident is critical to the credibility of plaintiff's allegations, because she admits that on September 23, 2010, she *voluntarily* made a loan of $600 to defendant Gadsden (Ross Aff. Ex. 7). If the incident occurred prior to the date on which she made this loan, plaintiff's story makes no sense, and her credibility is destroyed----why would she voluntarily make a loan to an individual who had assaulted her in the employee breakroom and otherwise stalked and harassed her?

During defendant Regal's internal investigation of plaintiff's allegations against Gadsden, Gadsden submitted a written statement that (a) admitted that there was an incident in the break-room, but attested that it occurred in May 2010 on the date that the movie "Iron Man" opened, and involved nothing more than a friendly kiss, (Ross Aff. Ex. 8) (b) asserted that from May 2010 to September 23, 2010, when he received the loan from plaintiff, he and plaintiff regularly socialized with each other and with their children, (Ross Aff. Ex. 9 D00841-D00842)

5

and (c) asserted that plaintiff filed the harassment charge against him only after defendant Gadsden had rejected plaintiff's request that he return the $600 money that had been loaned to him prior to the agreed date for repayment of that amount (Ross Aff. Ex. 9 D00843). The timing of the incident in the break-room, thus, became critical because, if it occurred in May 2010, rather than September, the circumstantial evidence would support Gadsden's story rather than plaintiff's allegations of harassment.

While at early stages of the litigation, it may have been appropriate for plaintiff's counsel to litigate plaintiff's assertion that Gadsden assaulted her in the break-room after receiving the loan, during the course of discovery it became clear that plaintiff's story could not withstand scrutiny. Early in the discovery process, plaintiff's counsel should have learned from documents produced by defendants that (a) plaintiff voluntarily loaned Gadsden $600 on September 23, (Ross Aff. Ex. 7) and (b) from May 2010 through September 23, 2010, Gadsden and plaintiff regularly socialized together---both alone and with their children (Ross Aff. Ex. 9). They went to the movies with their children, shared rides home, shared coffee at Starbucks, (Ross Aff. Ex. 9 D000842) and planned a trip to Hershey, PA with their children (Ross Aff. Ex. 4 p. 228-229). Thus, during the time period when plaintiff's complaint alleges that Gadsden was engaging in a continuing pattern of harassment, the evidence showed that plaintiff and Gadsden were voluntarily and regularly socializing with each other.

Even more importantly, however, based on admissions during her deposition, defendants produced documents which prove beyond a shadow of a doubt that the incident in the break-room occurred on May 7, 20010 and not, as claimed by plaintiff, late September 2010. Specifically, (a) the evidence shows that Iron Man 2 opened on May 7, 2010 (Ross Aff. Ex. 10); (b) plaintiff testified that after the incident in the break-room, her manager, Jenna Sooknanan,

came looking for her because she had taken an unusually long break (Ross Aff. Ex. 4 p. 180); and (c) plaintiff testified that there was no lock on the door at the time of the incident in the break-room (Ross Aff. Ex. 4 p. 152). We examined the scheduling records showing the shifts of plaintiff, defendant Gadsden and Jenna Sooknanan from May to November. The only shifts where plaintiff took a longer than usual break (i.e., longer than 30 minutes) are (1) May 7—37 minutes, (2) May 14—37 minutes, (3) May 28—41 minutes, (4) May 29—37 minutes, (5) August 2—42 minutes, (6) August 3-39 minutes, (7) August 10—39 minutes, and (8), August 20, 40 minutes (Ross Aff. Ex. 11). When these dates are compared with Mr. Gadsden's (Ross Aff. Ex.12) and Ms. Sooknanan's schedules, (Ross Aff. Ex. 13) there are only two shifts during which plaintiff took an over-long break that match with Mr. Gadsden's and Ms. Sooknanan's schedules---May 7 and August 10. However, we located (and produced to plaintiffs' counsel) a copy of an invoice dated August 10, 2010 which demonstrates that a lock was installed on the door shortly before the date of the invoice (Ross Aff. Ex. 14). This rules out August 10 as the date when the alleged incident occurred. Clearly, the only date when this alleged incident in the break-room (followed by the interaction with Jenna Sooknanan) could have occurred is May 7, 2010----the date of the Iron Man 2 movie release (Ross Aff. Ex. 10). Importantly, this is consistent with Mr. Gadsden's original statement to Regal's management in October 2010, which maintained that the incident in the break-room occurred in May 2010 (Ross Aff. Ex. 8).

Shortly after plaintiff's deposition, we produced the aforesaid scheduling documents and invoice which verify all of the foregoing (Ross Aff. Ex. 11; Ross Aff. Ex. 11; Ross Aff. Ex. 12; Ross Aff. Ex. 13). This evidence—which is incontestable, establishes beyond any plausible doubt that the incident in the break-room occurred in May—and of equal importance, it could not possibly have happened *after* plaintiff made the $600 loan to defendant Gadsden. Moreover,

7

this evidence also clearly establishes that plaintiff unquestionably perjured herself when she testified during her deposition that the event occurred after September 23, 2010, and that she reported it within a week or two thereafter (Ross Aff. Ex. 4 p. 196).

When defendants produced this evidence to them following plaintiff's deposition, plaintiff's counsel knew or should have known that plaintiff's entire story fell apart since the incident in the break-room occurred months before plaintiff provided the loan to Gadsden. After receiving this evidence, plaintiff's counsel could no longer in good faith prosecute the claims in this case.

### 3. Cajamarca's Claims of Damages and Post Traumatic Stress Disorder Constituted A Fraud on the Court

Plaintiff's counsel alleged throughout the course of this litigation that plaintiff suffered from debilitating, disabling psychological injury in the form of PTSD, injury that was life changing and "career ending" (Ross Aff. Ex. 6 p. 19). Then plaintiff's counsel purported to support this claim by submitting a report from an "expert" who asserted that plaintiff was disabled, unable to perform her normal life functions, bed-ridden (Ross Aff. Ex. 15) and in a "vegetative" state (Ross Aff. Ex. 18 p. 141-143). While plaintiff's counsel may have had a legitimate basis for asserting these claims when the law suit was first instituted, during the course of discovery it became clear beyond a shadow of a doubt that these claims were baseless--- indeed, that plaintiff's alleged damages and psychological injury were nothing less than a fraud on the Court.

First, during the course of pre-trial investigation by defendants' counsel, defendants discovered that, during the time that plaintiff was allegedly "bed-ridden" and unable to work, (Ross Aff. Ex. 6 p.13-14) and in a "vegetative" state (Ross Aff. Ex. 18 p.141-143), plaintiff traveled extensively outside of New York City (Ross Aff. Ex. 4 p. 251). Specifically, when the

grandfather of her children fell seriously ill, plaintiff took a trip from New York to Ohio in order to clean out the grandfather's house and retrieve a car that he had given to her (Ross Aff. Ex. 4 p. 254). While driving the car back to New York she was pulled over for speeding (Ross Aff. Ex. 4 p. 256) and arrested on an outstanding warrant stemming from a prior drug conviction in Ohio (Ross Aff. Ex. 16). Plaintiff was subsequently held in custody for a number of days during which time she was able to coordinate the care of her children and work with an attorney to resolve her outstanding warrant (Ross Aff. Ex. 4 p. 259-263). After her release, plaintiff rented a car and completed the drive back to New York with her children (Ross Aff. Ex. 4 p. 283).  All of this was accomplished during a period in which she was representing to her health care providers and Regal that she was disabled, unable to work, (Ross Aff. Ex. 17 p. 51-52) and vegetative (Ross Aff. Ex. 18 p.141-143). Further, she admitted during her deposition that she traveled on several other occasions while she maintained to her health-care providers and others that she was disabled and unable to work (Ross Aff. Ex. 4 p. 251). Plaintiff's expert, who submitted a report in support of plaintiff's damages allegations, was unaware of these trips at the time he prepared his expert report (Ross Aff. Ex. 23). While it is possible that plaintiff's counsel was unaware of plaintiff's travels at the time they initiated the law suit, by the time that plaintiff acknowledged taking these trips during her deposition, plaintiff's counsel knew or should have known that plaintiff's damages claim was a complete fraud.

Second, in addition to her travels, plaintiffs' social networking postings on Facebook belied her claim that she was suffering from debilitating PTSD and otherwise depressed, withdrawn, bedridden, sexually traumatized and unable to function.  During the timeframe when she was claiming to be traumatized and disabled, she created 100's of pages of "wall posts" (Ross Aff. Ex. 19) and "personal messages" (Ross Aff. Ex. 20) through her Facebook account.

9

For example, the records showed that during the time that she was allegedly debilitated and vegetative, she reached out to friends to exchange new phone numbers and to discuss plans for going out (Ross Aff. Ex. 20 FB0165), discussed her plans for returning to school, (Ross Aff. Ex. 19 FB0127), discussed grilling food in celebration of Labor Day (Ross Aff. Ex. 19 FB0053) acknowledged visiting a fireworks display on the Fourth of July (Ross Aff. Ex. 19 FB0068) and going out to the movie theatre (Ross Aff. Ex. 19 FB0077). These messages revealed that she continued to live an active social life. Incredibly, despite alleging that she was emotionally incapable of returning to work because of fear that she would be ostracized by other Regal employees, she reached out to, and communicated with co-workers and managers at the theatre where she had worked (Ross Aff. Ex. 4 294-296).

In addition to the foregoing, she regularly posted sexually explicit comments and invitations on her Facebook wall. These comments ranged from innocuous discussions of "pick up" lines (Ross Aff. Ex. 19 FB0056) to far more obscene commentaries (Ross Aff. Ex. 19 FB0052, FB0055). Plaintiff was also engaged in sending flirtatious (Ross Aff. Ex. 20 FB0164), and occasionally lewd (Ross Aff. Ex. 20 FB0171, FB0176) messages to strangers via Facebook's messenger interface.

Third, during the course of the litigation, defendants' investigation revealed facts concerning her social and personal history which further confirmed that her claims were baseless and fraudulent. Plaintiff claims that her primary injury occurred as a consequence of a single alleged incident in the break room of a duration of about five minutes, during which plaintiff alleges she was shocked and traumatized because Gadsden showed her his penis and masturbated in front of her (Ross Aff. Ex. 6 p. 13-14). She repeatedly told Regal's management and her treating psychiatric and psychological care-givers that she was haunted and traumatized by this

10

brief encounter with Gadsden, and that the sight of Gadsden's genitalia was a life altering shock (Ross Aff. Ex. 17 p. 50-52). However, defendants' investigation revealed that plaintiff had previously been charged with prostitution, and that she had worked in Arizona as an escort and prostitute (Ross Aff.. Ex. 21). She admitted this during her deposition, acknowledging that she had placed an advertisement for escort services in a local newspaper (Ross Aff. Ex. 4 p. 85) that she carried a beeper for this purpose, (Ross Aff. Ex. 4 p. 84) and that she was arrested for prostitution in an under-cover sting operation (Ross Aff. Ex. 4 p. 82-83). Documents revealed during discovery also disclosed that she had multiple pregnancies and miscarriages, (Ross Aff. Ex. 22) at least three marriages, (Ross Aff. Ex. 4 p. 172) and that she lived an active sex life for many years with multiple partners, (Ross Aff. Ex. 4 p. 87) visiting swingers clubs with her former husband in both Las Vegas and Arizona (Ross Aff. Ex. 4 p. 41-42). In the face of her admitted sexual history, plaintiff's suggestion that she suffered life-altering psychiatric injury and sexual trauma because Gadsden allegedly showed her his penis and masturbated in front of her in a single brief encounter is simply not plausible.

It is possible that plaintiff's counsel was unaware of plaintiff's sexual history prior to her deposition and, thus, that plaintiff's counsel could have believed plaintiff's assertion that the incident in the break room had caused her to suffer life-altering psychological distress. But once plaintiff was deposed, plaintiff's counsel could no longer assert that they were unaware of plaintiff's sexual history. Rather, following plaintiff's deposition, plaintiff's counsel could no longer proceed in good faith with the theory at the heart of their case—that plaintiff suffered life altering psychological damage as a result of the alleged "break-room" incident.

In addition, the exchange of expert reports should have further alerted plaintiff's counsel that plaintiff's damages claims were fraudulent. Defendant's expert, Dr. Goldwaser, was the first

psychiatric professional to undertake a full forensic examination of plaintiff. Goldwaser reviewed extensive documentary evidence concerning plaintiff's social and sexual history and her social life, including her arrest records, court records, employment records and social networking records (Ross Aff. Ex. 23 p. 3-6), After reviewing these voluminous materials, Dr. Goldwaser examined plaintiff for over four hours (Ross Aff. Ex. 23 p. 51). In a lengthy, carefully drafted expert report, he concluded that plaintiff was not suffering from PTSD, and that her claim to have suffered debilitating, life altering psychological injury as a result of the incident in the break-room was simply not plausible (in his professional expert opinion) (Ross Aff. Ex. 23 p. 82).

In contrast, Plaintiff's counsel engaged an expert who did not undertake a forensic examination and only met with Cajamarca for a brief period of time (approximately one half hour) (Ross Aff. Ex. 18 p. 35). Plaintiff's expert admitted during his deposition that during this half our examination, he accepted plaintiff's assertions as true (Ross Aff. Ex. 18 p. 45). He also admitted, however, that plaintiff had not disclosed (a) her travels---including her arrest during the time she was allegedly traumatized and bed-ridden (Ross Aff. Ex. 18 p. 44-45), (b) her history of prostitution and drug abuse and her other arrest records (Ross Aff. Ex. 18 p. 71-72, 147), (c) her social history, including her marriages, multiple pregnancies and multiple miscarriages (Ross Aff. Ex. 18 p. 84), and (d) the nature and extent of her ongoing social networking activities (Ross Aff. Ex. 18 p. 140). Instead, plaintiff's expert merely accepted plaintiff's statements to him at face value.

After comparing Dr. Goldwaser's report with their expert's report, plaintiff's counsel should have realized that their expert report could not withstand scrutiny. The findings therein were not supported by a reasonable forensic examination and contrary to evidence known to

12

plaintiff's counsel.   Specifically, plaintiff's counsel knew based on the evidence that the assertion by their expert that plaintiff was "vegetative" and "bed-ridden" was wrong.   And yet plaintiff's counsel continued to rely on this expert report.   The submission of, and reliance on, this expert report by plaintiff's counsel was indicative of their bad faith and vexatious approach to this litigation.   No reasonable attorney could have submitted this expert report based on the facts that had been disclosed during discovery, but were not disclosed by plaintiff's counsel to plaintiff's expert, concerning plaintiff's social, criminal and sexual history.     Further, no reasonable attorney could have allowed an expert to submit a report alleging that plaintiff was suffering from debilitating psychological injury (Ross Aff. Ex. 15).   In view of the evidence produced during discovery, the expert report produced by plaintiff's was nothing more than a sham.

### 4. Plaintiff's Counsel Should Have Known That Regal Behaved Reasonably in Its Investigation and Subsequent Treatment of Plaintiff Cajamarca

Whatever plaintiff's counsel may have believed about the defendant Regal's conduct when they filed their complaint, they very quickly learned that most of the allegations in the complaint concerning Regal's conduct were untrue. Very early in the litigation Regal clearly demonstrated that it had an adequate reporting system in place and that all of the prescribed steps were followed in the immediate aftermath of plaintiff's initial complaint against Gadsden (Ross Aff. Ex. 1 p. 20.) Further Regal provided evidence that demonstrated that, contrary to plaintiff's claims of retaliation, Regal had been exceptionally accommodating of plaintiff, inviting her to relocate to another theatre and granting her requests for several leaves of absence (Ross Aff. Ex. 1 p. 22). And Regal provided evidence and written statements that directly contradicted many of the allegations concerning the conduct of Regal's managers and executives. At least by the time plaintiff's deposition was take, plaintiff's counsel was well aware that Regal's conduct was in no

13

way culpable and yet they persisted in litigating against Regal.  As this Court found in its opinion

granting defendant's summary judgment motion, Regal's investigation complied with its internal

policies, and its investigation was thorough and entirely reasonable.  Plaintiff and her counsel

had no reasonable basis in fact for questioning whether defendant Regal had adequate policies in

place and complied with those policies when it investigated plaintiff's complaint.  Moreover, as

this Court wrote:

> Conspicuously absent from plaintiff's argument, however, is any suggestion as to
> what more Regal should have done. Although plaintiff's submission to Jones
> describing this post solution environment was lengthy, it only described three
> specific incidents- her opinion that she been told not to work for 1 1/2 hours to avoid
> Gadsden; the remark to her son by another manager; and the insulting caricature of
> Gadsden attempted by another manager. Jones and Green investigated the time
> allegation and the documentary evidence showed that there was simply no basis for
> plaintiff's opinion that her time had been reduced to accommodate Gadsden. They
> imposed a disciplinary sanction against the manager who made a misplaced attempt
> at humor with her son. The record does not show any action with regard to the
> manager who imitated Gadsden, but as plaintiff herself said in her complaint about
> it, she considered that manager "a really good person and a good manager but one
> day he made the mistake of trying to make me feel comfortable" by imitating
> Gadsden in a way that made Gadsden look like a fool. No reasonable jury could
> conclude that Regal was required to take action as to that or that there was any
> retaliatory intent behind the manager's action. Further, although plaintiff complained
> to Regal that "people are treating me differently," she gave Regal no specifics other
> than the three incidents described above and Gadsden's empty boasting, and in this
> case, points to no further action that Regal should have taken. But Regal, in fact, did
> more. Since plaintiff's post-solution complaint made it clear that she was horribly
> uncomfortable working at Midway, it offered her at least a temporary transfer to the
> Union Square theatre, which she accepted. Plaintiff does not allege that the
> atmosphere at Union Square was hostile, or that there was any other problem there.
> Indeed, after receiving 90 days of leave, plaintiff expressed a desire to go back to
> Union Square at some undefined point in the future. Her claim thus devolves into an
> implicit assertion that Regal had an obligation to either keep the spot at Union
> Square open for what would have been a clearly lengthy and possibly unlimited
> period (she had already taken 90 days of leave, which was 60 days in excess of
> Regal's policy), or to pay her damages because it was strictly liable for Gadsden's
> misconduct. Title VII did not require Regal to take either of those courses.

(Ross Aff. Ex. 1 p. 18-19).  Further, as this Court found:

> By quickly and thoroughly investigating the problem and then proposing a solution to
> which plaintiff seemed agreeable, Regal has satisfied the *Faragher/Ellwerth* defense.

> No reasonable juror could conclude otherwise, and Gadsden's offensive behavior therefore cannot be imputed to Regal.

(Ross Aff. Ex. 1 p. 22)

While plaintiff's counsel might have reasonably asserted that Regal behaved unreasonably at the time it filed the complaint, by the time of plaintiff's deposition---when plaintiff admitted that she had agreed to a transfer to the Union Square theatre, plaintiff's counsel could no longer reasonably pursue this assertion. Plaintiff's counsel knew or should have known at an early stage of this case that no reasonable juror could conclude that Regal's investigation was unreasonable, or that its proposed solution---transfer of plaintiff to another theatre, was unreasonable.

Likewise, this Court also found that there was no basis for many other allegations in plaintiff's complaint concerning Regal's conduct, including, plaintiff's allegations of hostile work environment, retaliation and constructive discharge. (Ross Aff. Ex. 1 p. 15) As this Court found, the limited incidents upon which plaintiff relied: hearsay about one incident where Gadsden gloated; one manager's remark to plaintiff's son that plaintiff had been fired; a perceived, but incorrect belief on plaintiff's part that she had been sent home 1 ½ hours early so that she would avoid Gadsden; and another manager's good-natured but misplaced effort (which is the way plaintiff characterized it) to make plaintiff feel better by mocking Gadsden - coupled with a general allegation that employees treated her differently, did not constitute, separately or together, a hostile work environment (Ross Aff. Ex. 1 p. 24-25). Plaintiffs' counsel knew, or should have known that none of these incidents, individually or collectively, could be deemed "materially adverse." These were simply the kind of " petty slights or minor annoyances that often take place and that all employees experience" *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 59-60, 68 (2006). Plaintiff's counsel should have realized that plaintiff's hostile work environment, retaliation and

15

constructive discharge allegations were predicated solely on these "petty slights" and "minor annoyances".  Despite the clear, if not overwhelming evidence that no reasonable juror could accept plaintiff's allegations against Regal, plaintiff's counsel pursued those allegations vexatiously and in bad faith.

## ARGUMENT

**I.  PLAINTIFF SHOULD BE REQUIRED TO PAY DEFENDANTS' ATTORNEYS FEES UNDER TITLE VII**

Under Title VII of the Civil Rights Act, a prevailing party is entitled to recover reasonable attorney's fees. 42 U.S.C. §2000e-5(k). In interpreting this statute, courts have looked to Congress' intent in the creation of this entitlement and found that, in order for a defendant to recover fees, it must make a showing that plaintiff's action was "frivolous, unreasonable, or without foundation" or that "the plaintiff continued to litigate after it clearly became so." *Christianburg Garment Co. v. Equal Employment Opportunity Commission*, 434 U.S. 412, 422 (1978). A defendant need not show that the suit was brought or continued in subjective bad faith but merely that it was groundless. *Id.*

As shown above, even if we assume that plaintiff and her counsel had a reasonable basis for commencing suit, by the time plaintiff was deposed, plaintiff and her counsel should have realized that her claims were frivolous and unreasonable. The documents and testimony produced by defendants and their employee witnesses during discovery made it abundantly clear that Regal responded reasonably to plaintiff's complaints and provided plaintiff a solution---transfer to another theatre, that was agreeable to plaintiff.  As the Court found, plaintiff's allegations concerning the hostile work environment and retaliation issues amounted to a recitation of nothing more than petty slights and minor annoyances.   And the evidence demonstrated that Regal bent over backwards to accommodate plaintiff, granting her several

16

administrative leaves even though Regal had no legal obligation to do so, and inviting her to reapply for a position when she was ready to do so. In short, by the time of plaintiff's deposition, plaintiff and her counsel knew or should have known that their claims against Regal were groundless.

Further, the documents revealed during discovery should have made it apparent to plaintiff and her counsel that the breakroom incident---the very foundation of plaintiff's story and her damages claim---occurred in May rather than, as alleged by plaintiff, in September after she had loaned $600 to defendant Gadsden. Because the breakroom incident occurred in May, plaintiff's entire story is in shambles, and her credibility destroyed. See, *Carrion v. Yeshiva University*, 535 F.2d 722, 728(2d Cir. 1976)(in view of discredited testimony of plaintiff, it was appropriate to award the defendant attorneys fees).

Further, by the time plaintiff was deposed, plaintiff's counsel knew or should have known that plaintiff's damages claim was a fraud on the Court. Given her admitted background as an escort and prostitute, it is inconceivable that the alleged break-room incident with Gadsden could have caused the severe, life-changing psychological trauma alleged by plaintiff. Further, plaintiff admitted that, during the time that she was allegedly vegetative, bed-ridden, and unable to work, she traveled extensively with her children, attended to the personal affairs of the ill grandfather of her children, dealt with an arrest in Ohio for an outstanding warrant in a drug case, and after having been released after several days of incarceration, rented a car and drove home with her children to New York. And the social networking documents produced by plaintiff obviously and clearly conflicted with her claim that she suffered from debilitating psychological injury.

In short, the discovery process established beyond any doubt that plaintiff's claims were baseless, that her story concerning alleged sexual harassment by Gadsden was not credible and— indeed false, and that her claim for damages was essentially a fraud on the Court. Yet plaintiff and her counsel continued to pursue these frivolous claims through the summary judgment process. In these circumstances, defendants should be awarded attorneys fees as the prevailing party.

## II.   PLAINTIFF'S COUNSEL SHOULD BE SANCTIONED UNDER FRCP RULE 11

FRCP Rule 11 provides that court filings by an attorney are "to the best of the signer's knowledge, information and belief formed after reasonable inquiry if it is well grounded in fact." Fed.R.Civ.P. 11. In order to be sanctionable a court need not find that an attorney's conduct was undertaken in subjective bad faith but merely that the conduct falls short of objective reasonableness. *ATSI Communications, Inc. v. The Shaar Fund, Ltd.*, 579 F.3d 143, 150-151 (2d Cir. 2009); *Ted Lapidus S.A. v. Vann*, 112 F.3d 91, 96 (2d Cir. 1997); *Derechin v. State University of New York*, 963 F.2d 513, 520 (2d Cir. 1992); *cf In re Pennie & Edmonds LLP*, 323 F.3d 86, 91 (2d Cir. 2003) (where district court *sua sponte* initiates Rule 11 sanctions "long after" the sanctioned lawyer had an opportunity to correct or withdraw the challenged submission, the lawyer may be sanctioned only upon a finding of subjective bad faith).[2]

While it may have been objectively reasonable for plaintiff's counsel to initiate this litigation, at a relatively early stage of the discovery process, it should have become clear to plaintiff's counsel that plaintiff's claims were objectively baseless. Even before depositions, the documents produced by defendants concerning their internal investigation of plaintiff's

---

[2] During the course of the litigation, defendants counsel repeatedly notified plaintiff's counsel that defendants intended to seek Rule 11 Sanctions because their pursuit of the litigation was objectively unreasonable. (Ross Aff. Ex. 2) Therefore, plaintiff's counsel was given more than ample notice and opportunity to withdraw plaintiff's claims, and the "safe harbor" provisions of Rule 11 do not preclude defendants' counsel from pursuing this motion.

allegations should have put plaintiff's counsel on notice that plaintiff's claims were highly suspect.  Regal produced its human resources and personnel files relating to this matter which reflected the nature and scope of Regal's response to, and investigation of, plaintiff's complaints. After receiving these documents, plaintiff's counsel should have known that their claims against Regal were baseless.  In the face of this evidence, plaintiff's counsel could no longer in good faith pursue its claims against Regal.

Further, once the deposition of plaintiff was completed, plaintiff's counsel knew or should have known that many of the allegations in the complaint concerned nothing more than petty slights and minor annoyances.  Yet plaintiff's counsel continued to contend that these petty slights and minor annoyances support plaintiff's claims of retaliation and a hostile work environment. It was improper for plaintiff's counsel to continue to pursue claims when the evidence plainly established that they were groundless.

Even more troubling, however, is that plaintiff's counsel continued to allege that plaintiff suffered from debilitating, disabling, career-ending PTSD and psychological trauma after the evidence established that plaintiff's damages claim was a fraud.  Instead of being bed-ridden and unable to work, plaintiff admitted that she traveled extensively with her children, attended to the affairs of the ill paternal grandfather of her children,  navigated through the Ohio legal system after being arrested for an outstanding warrant in a drug case, and then drove back with her children from Ohio to New York. Further, the startling revelations resulting from plaintiff's active participation on social networking web-sites, and especially Facebook, belied plaintiff's damages claim. Plaintiff's counsel simply could not reasonably continue to pursue the damages claims alleged in plaintiff's complaint.  Rather, plaintiff's counsel should have realized that these damages claims were a fraud on the Court.

Further, defendants produced documents demonstrating conclusively that the "break room" incident could not have occurred after plaintiff loaned $600 to defendant Gadsden, but must have occurred many months earlier. This evidence essentially destroyed plaintiff's entire story concerning Gadsden's alleged pattern of sexual harassment. Upon receipt of this evidence, plaintiff's counsel should have known that plaintiff perjured herself in her deposition concerning the break-room incident, that plaintiff's credibility was essentially destroyed, and that plaintiff's claims against Gadsden were objectively baseless.

In these extreme circumstances, plaintiff's counsel had a duty to withdraw the pleadings in this case, but instead plaintiff's counsel continued to pursue each and every claim through the summary judgment process. We submit that this is a classic example of a case in which Rule 11 Sanctions are warranted.

## III.   DEFENDANTS ARE ENTITLED TO RECOVER FOR EXCESSIVE COSTS UNDER 28 U.S.C §1927

Plaintiff's counsel should be responsible for defendants' attorneys' fees under 28 U.S.C §1927. Under this provision attorneys may be liable for fees incurred due to conduct that "multiples the proceedings in any case unreasonably and vexatiously." In order to prevail the party asserting a claim for fees must demonstrate that opposing counsel proceeded with a claim that was completely without a colorable basis and that the continued litigation was in bad faith. *Enmon v. Prospect Capital Corp.,* 675 F.3d 138, 143-144 (2d Cir. 2012); *Schlaifer Nance & Co., Inc. v. Estate of Warhol,* 194 F.3d 323 (1999). "A claim is entirely without color when it lacks any legal or factual basis." *Sierra Club v. United States Army Corps of Eng'rs,* 776 F.2d 383, 390 (2d Cir. 1985). Further, bad faith can be found where an attorney's actions are "so completely without merit as to require the conclusion that they must have been undertaken for

some improper purpose." *People of the State of New York v. Operation Rescue Nat'l*, 80 F.3d 64, 72 (2d Cir.1996).

There is clear and compelling evidence that the conduct of plaintiff's counsel was in bad faith. Aside from the objectively baseless nature of the claims which they pursued, they engaged in egregious misconduct in two critical respects:

First, it is indisputable that they failed to place a "litigation hold" in this case even after learning that plaintiff's social activities, social networking activities, and electronic records relating thereto would likely be of critical relevance to this case. During her deposition, plaintiff admitted that she destroyed thousands of files on her computer on the day before she turned it over for inspection. Incredibly, she also testified that her counsel never told her she had an obligation to preserve her electronic records on her cell telephones and computers, or that there would be anything wrong with her decision to delete files from her computer. The failure by plaintiff's counsel to institute a litigation hold, and their subsequent failure to preserve plaintiff's electronic evidence on her computer and cell telephones, reflects a bad faith indifference by plaintiff's counsel to their professional obligations. Plaintiff's counsel in civil rights cases have no less a duty to institute litigation holds and preserve evidence than counsel for the companies they accuse of wrongdoing.

Perhaps most shocking of all, however, is the submission by plaintiff's of an expert report that plaintiff's knew, or should have known, was grossly misleading and inadequate---and indeed, part of plaintiff's attempt to commit a fraud on this court. Plaintiff's damages expert admitted during his deposition that he interviewed plaintiff for only a short period of time (about 30 minutes) and accepted what she told him at face value without conducting any forensic analysis of relevant evidence concerning her personal, social and criminal history. At the time

they submitted this expert report, plaintiff's counsel knew, or should have known, that the conclusions in this report were false, and represented plaintiff's attempt to commit a grave fraud on this Court. Plaintiff's counsel were able to procure this expert report only because they failed to disclose to this expert highly probative information that they received during discovery that put the lie to her claims of PTSD and other psychological damage. Plaintiff's expert could not have concluded that plaintiff was "vegetative" had he been aware of the evidence showing, *inter alia*, plaintiff's extensive traveling during the time when she was supposedly bed-ridden, plaintiff's arrest, incarceration, and navigation through the legal system in Ohio while she was supposedly "vegetative", plaintiff's drive from Ohio to New York with her two children, her criminal history, her social activities and her related social networking postings. Perhaps most importantly, plaintiff's counsel failed to disclose that plaintiff admitted during her deposition to having worked as an escort and prostitute, information that any psychiatric expert would be likely to find critical to assessing the veracity and validity of plaintiff's claimed psychological trauma. By keeping their expert in the dark, plaintiff's counsel procured a favorable expert report that they knew, or should have known, was fundamentally wrong. The conduct of plaintiff's counsel in procuring this expert report and submitting in this litigation to support plaintiff's fraudulent damages claims was nothing short of reprehensible.

Simply stated, plaintiff's counsel could not, in good faith, have procured and submitted this expert report. By the time that plaintiff's expert report was prepared and submitted in this case, it should have been apparent to plaintiff's counsel that plaintiff's claim that she suffered from debilitating psychiatric injury was a fraud. Without question, the procurement and submission of this expert report by plaintiff's counsel was improper and in bad faith.

22

Further, the conduct of plaintiff's counsel with regard to the "litigation hold" and "expert report" issues was indicative of a pattern that was repeated throughout the litigation process, which forced defendants to expend substantial resources to investigate and defend baseless claims. This is, we submit, a classic example of the type of vexatious and improper litigation misconduct that justifies sanctions under Section 1927. We believe the appropriate sanction in this case would be to issue an order making plaintiff's counsel jointly and severally liable for plaintiff's costs and attorneys fees (including the expenses incurred by defendants in retaining experts and private investigators).

## CONCLUSION

Based on the foregoing, we request that the Court issue an Order (a) granting defendants their attorneys fees and costs as the prevailing parties as against plaintiff, and (b) sanction defendants' counsel under FRCP Rule 11 and 28 U.S. C. Section 1927 by issuing an order and judgment holding defendants' counsel jointly and severally liable with plaintiffs for defendants costs and attorneys fees, in the amounts set forth in the accompany Affidavit of Maurice Ross, Esq.


Dated:   New York, New York
         July 12, 2012

**BARTON LLP**


By: _____
    Maurice N. Ross (MR 6852)

420 Lexington Avenue
New York, NY 10170
mross@bartonesq.com
*Tel.:* (212) 687-6262
*Fax:* (212) 687-3667

*Attorneys for Defendants Regal
Entertainment Group and Otis Gadsden*

24